**In re the WALT DISNEY COMPANY DERIVATIVE LITIGATION.**

**Consolidated C.A. No. 15452.**

Court of Chancery of Delaware,
New Castle County.

Submitted: April 30, 1998.
Decided: Oct. 7, 1998.

348

Joseph A. Rosenthal, and Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, of counsel: Steven G. Schulman, Edith M. Kallas, and U. Seth Ottensoser of Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, San Diego and Los Angeles, CA, for Plaintiffs.

David C. McBride, of Young, Conaway, Stargatt & Taylor, Wilmington, of counsel: Ronald L. Olson, George M. Garvey, and Mark H. Epstein, of Munger, Tolles & Olson LLP, Los Angeles, CA, for Defendant Michael S. Ovitz.

R. Franklin Balotti, Anne C. Foster, Srinivas M. Raju, and Peter B. Ladig, of Richards, Layton & Finger, Wilmington, for Director Defendants.

Andre G. Bouchard, and Joel Friedlander, of Bouchard, Friedlander & Maloneyhuss, Wilmington, of counsel: Edward J. Nowak, and Jay S. Handlin, Burbank, CA; and Dewey Ballantine, Los Angeles, CA, for the Walt Disney Company.

## OPINION

CHANDLER, Chancellor.

This case arises from a corporate board's decision to approve a large severance package for its president. Certain shareholders of the corporation seek relief from the Court of Chancery because that board actually honored the corporation's employment contract when the president left the company. The sheer magnitude of the severance package undoubtedly sparked this litigation, as well as the intense media coverage of the ensuing controversy over the board's decision. Nevertheless, the issues presented by this litigation, while larger in scale, are not unfamiliar to this Court.

Just as the 85,000-ton cruise ships *Disney Magic* and *Disney Wonder* are forced by science to obey the same laws of buoyancy as Disneyland's significantly smaller *Jungle Cruise* ships, so is a corporate board's extraordinary decision to award a $140 million severance package governed by the same corporate law principles as its everyday decision to authorize a loan. Legal rules that govern corporate boards, as well as the managers of day-to-day operations, are resilient, irrespective of context. When the laws of buoyancy are followed, the *Disney Magic* can stay afloat as well as the *Jungle Cruise* vessels. When the Delaware General Corporation Law is followed, a large severance package is just as valid as an authorization to borrow. Nature does not sink a ship merely because of its size, and neither do courts overrule a board's decision to approve and later honor a severance package, merely because of *its* size.

## I. INTRODUCTION

At its heart, this case is about the decision of the Walt Disney Company ("Disney" or the "Company") Board of Directors to approve an employment contract with a large severance provision for Michael Ovitz, referred to by some as the "Most Powerful Man in Hollywood." Disney convinced Ovitz to leave his position as head of Creative Artists Agency ("CAA") and become president of Disney. This case arose after the Disney Board's decision, subsequent to Ovitz's failure to become an effective president, to honor their employment agreement with its attendant severance provisions. This is a noteworthy case because the severance payment is large—larger than even the expert hired by the Disney Board to explain the contract imagined it to be, larger than almost anyone anywhere will receive in the lifetime of any of the parties, and perhaps larger than any ever paid.

The facts, in summary, are as follows: Ovitz gave up his lucrative position at CAA to come to Disney and was rewarded handsomely for it, both in salary (on the upside) and in potential severance (on the downside). After fourteen months, all parties agreed that Ovitz was not working out as president, so he left the company. The parties disagree as to how he left, but the fact is that after he left the Board awarded him the significant amount of severance detailed in his employment agreement. Ovitz gave up options that he could have received had he stayed longer, and Disney avoided protracted litigation with Ovitz over his rights under that agreement.

The case appears to be exceptional because of the sheer dollar amount involved. But does that mean the amount is *so* large that this Court should use its equitable powers to stop its payment? Does that mean it is so large that the conventional corporate governance laws of Delaware do not apply? No. This Court will analyze the claims of the Plaintiffs using the same tools it uses in any corporate law case, namely, the requirement of demand or its

excusal, the *Aronson v. Lewis* test, the basic rules of disclosure and, most significantly, the business judgment rule. Unless Plaintiffs can plead with specificity facts that rebut the presumption of the business judgment rule, that the Board was corrupted and could not make a decision fairly and independently, in the best interests of the Corporation, then the Board's decision will stand.

## II. PROCEDURAL HISTORY

Plaintiffs William and Geraldine Brehm filed this derivative action on behalf of the Walt Disney Company, a Delaware corporation. The Brehms alleged that twelve current or former members of Disney's Board of Directors (the "Board") breached their fiduciary duties by approving the employment agreement by which Michael S. Ovitz joined the Company as Disney's president. The Brehms also alleged that the Director Defendants breached their fiduciary duties by granting Ovitz a non-fault termination, thus entitling Ovitz to receive generous severance benefits under the terms of the agreement.

On January 28, 1997, the Director Defendants answered the initial complaint and moved for judgment on the pleadings on the ground that the Brehms had failed to comply with Court of Chancery Rules 12(b)(6) (failure to state a claim upon which relief can be granted) and 23.1 (failure to make demand on the Board). Two weeks later the Brehms moved to stay or voluntarily dismiss the litigation in this Court so that they could proceed with similar, if not identical, lawsuits in California. I denied the Brehms' motion because I found that Defendants would suffer prejudice if the Brehms were allowed to "dash in and out of a forum based on tactical considerations and an assessment that their case looks weak in light of governing law in a particular jurisdiction."[1] As a result, the Brehms agreed to stay their California lawsuits.

Meanwhile, the Brehms filed an amended complaint (the "amended complaint"), substantially enlarging the Delaware lawsuit. The Brehms added sixteen parties to the action as named Plaintiffs (collectively referred to as "Plaintiffs").[2] Second, in addition to the individual former or current Disney directors named as Defendants in the original complaint, Plaintiffs brought suit against the entire current Disney Board.[3] Third, Plaintiffs added class claims for breach of the fiduciary duty of disclosure. Finally, Plaintiffs added a claim directed solely against Ovitz for breach of contract.

Plaintiffs seek injunctive and rescissory or other equitable relief on behalf of Disney and its shareholders or, alternatively, damages. Specifically, Plaintiffs want to enjoin the fulfillment and enforcement of the employment agreement and to invalidate options granted to Ovitz as part of his

---

1. *In re The Walt Disney Co. Deriv. Litig.*, Del. Ch., C.A. No. 15452, Chandler, V.C., 1997 WL 118402 (Mar. 13, 1997), mem. op. at 8.

2. All named Plaintiffs in this action assert that they own Disney stock and have owned these shares at all times relevant to this lawsuit.

3. The individual Defendants in this action include the Disney directors who approved the Employment Agreement (the "former Board" or "former Directors") and the directors who approved Ovitz's severance package pursuant to the terms of the Employment Agreement (the "current Board" or "current Directors"). The former Board was comprised of Michael D. Eisner, Stephen F. Bollenbach, Roy E. Disney, Stanley P. Gold, Sanford M. Litvack, Richard A. Nunis, Sidney Poitier, Irwin E.

Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson, Gary L. Wilson, Reveta F. Bowers, Ignacio E. Lozano Jr., and George J. Mitchell. The amended complaint describes the current Board as comprised of Ovitz, Eisner, Disney, Gold, Litvack, Nunis, Poitier, Russell, Stern, Walker, Watson, Wilson, Bowers, Lozano, Mitchell, Leo J. O'Donovan and Thomas S. Murphy. Disney reduced its Board by one seat in 1996 when Ovitz left the Company.

For purposes of this opinion, all the Director Defendants except for Ovitz will be referred to as "Director Defendants." Collectively, the Director Defendants and Ovitz will be referred to as "Defendants."

severance package under the terms of the agreement. Director Defendants and Ovitz have responded with separate motions to dismiss.

## III. BACKGROUND FACTS

In September 1995, Michael D. Eisner, chairman of the board and chief executive officer of Disney, recruited and hired his friend, Michael S. Ovitz, to serve as Disney's president.[4] On October 1, 1995, Ovitz and Eisner signed a five-year employment contract (the "Employment Agreement" or the "Agreement") which the Disney Board approved unanimously. Thereafter, Ovitz was nominated and elected to serve as a director on Disney's Board.

Pursuant to the Employment Agreement, Ovitz was to receive an annual salary of $1 million, a discretionary bonus, and options to purchase five million shares of Disney common stock. These options would vest in increments of one million shares on September 30 of each year, commencing in 1998.

Of particular significance to this case, under the Employment Agreement, if Disney terminated Ovitz's employment without good cause[5] or if Ovitz resigned from Disney with the consent of the Company (referred to in the Employment Agreement as a "Non–Fault Termination"), three million of Ovitz's options would vest immediately upon his separation from the Company, and Ovitz would be entitled to wait until the later of September 30, 2002, or twenty-four months after the date of separation to exercise these options.[6] The Employment Agreement also provided for

Ovitz to receive a lump payment of $10,-000,000 if he were terminated without cause prior to September 30, 2002. In addition, if Ovitz were terminated without cause, he would receive an additional payment equal to the present value of the remaining salary payments due under the Agreement through September 30, 2000, as well as the product of $7.5 million times the number of fiscal years remaining under the Agreement (*i.e.*, Ovitz's approximate foregone bonuses).

Ovitz's employment with Disney did not work out well, and it was widely known that Ovitz was seeking alternative employment elsewhere. Plaintiffs allege that in September 1996, Ovitz sent Eisner a letter stating his desire to leave Disney. That letter notwithstanding, on December 11, 1996, only fourteen months after Ovitz joined Disney, Eisner consented to Ovitz's request for a Non–Fault Termination. The following day, Disney announced that Ovitz's employment with the Company would be terminated. Thereafter, the Disney Board approved Ovitz's Non–Fault Termination.

In early 1997, shareholders received a proxy statement notifying them of Disney's annual meeting. Among other things, the proxy statement solicited proxies concerning a new employment and compensation arrangement for Eisner (the "Eisner Compensation Agreement"), a new bonus plan for Disney executive officers (the "Bonus Plan," together with the Eisner Compensation Agreement, the "Bonus Plans"), and the re-election of five directors to Disney's staggered Board. At

---

**4.** Ovitz founded the venerable Creative Artists Agency, a firm of talent agents, in 1975 and served as its Chairman until he was hired by Disney in 1995.

**5.** The Ovitz Employment Agreement allowed Disney to fire Ovitz for "good cause" if he exhibited "gross negligence or malfeasance" in the execution of his duties. The Employment Agreement obligated Ovitz to "devote his full time and best efforts exclusively to the Company."

**6.** Pursuant to the Employment Agreement, Stock Option B—giving Ovitz the right to purchase two million shares of Disney stock— would not become exercisable prior to October 1, 2000, and the right would vest in increments of one million shares on September 30, 2001, and September 30, 2002. By leaving Disney, Ovitz would forfeit his right to purchase the remaining two million shares of Disney stock.

the annual meeting, the shareholders approved the Eisner Compensation Agreement and the Bonus Plan and re-elected five directors to the Board.

## IV. THE CLAIMS

### A. Plaintiffs' Complaint

Plaintiffs' amended complaint asserts four different claims in connection with the Employment Agreement and the Disney proxy statement used for the 1997 shareholders meeting. In their first count, Plaintiffs allege that the Director Defendants breached their fiduciary duties of loyalty, good faith, and due care, first by entering into the Employment Agreement with Ovitz and then by terminating Ovitz without cause, i.e., a Non–Fault Termination. Plaintiffs' second count alleges waste stemming from the Employment Agreement. Plaintiffs' third count is solely against Ovitz for allegedly breaching the Employment Agreement. Finally, Plaintiffs' fourth count asserts class claims against the current directors for breach of the fiduciary duty of disclosure. Specifically, the fourth count alleges that, in connection with the issuance of the 1997 proxy statement, the current Board made misleading representations concerning Disney's Bonus Plan, the Eisner Compensation Agreement, and the circumstances surrounding Ovitz's separation from Disney.

### B. Defendants' Motion to Dismiss

The Director Defendants and Ovitz have each moved to dismiss Plaintiffs' amended complaint, arguing, first, that the amended complaint fails to comply with Court of Chancery Rule 23.1, which requires Plaintiffs either to make a demand on the Board or to allege particularized facts that excuse such demand and, therefore, all

7. See Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 338 (1997) (citing Rabkin v. Philip A. Hunt Chem. Corp., Del.Supr., 498 A.2d 1099 (1985)).

8. Id.

counts must fail. Second, Defendants argue that all of Plaintiffs' allegations fail to state a claim against them, as Disney's certificate of incorporation bars liability for claims based on a breach of the duty of care, pursuant to § 102(b)(7) of the Delaware General Corporation Law. As to Plaintiffs' third count brought solely against Ovitz, Ovitz asserts that the amended complaint fails to allege facts sufficient to justify Plaintiffs' failure to make a demand on the Board regarding his alleged contract breaches. Finally, with regard to Plaintiffs' disclosure claims in their fourth count, Defendants request dismissal because the claims i) were not pursued in a timely fashion and, thus, are barred by laches, and ii) fail to state a claim upon which relief can be granted.

### C. Motion to Dismiss Standard

The standard of review on a motion to dismiss is well-settled under Delaware law. Where under any set of facts consistent with the facts alleged in the complaint the plaintiff would not be entitled to judgment, the complaint may be dismissed as legally defective.[7] Further, where a plaintiff's allegations are merely conclusory (i.e., without specific allegations of fact to support them) they are similarly insufficient to withstand a motion to dismiss.[8]

## V. BREACH OF FIDUCIARY DUTY AND WASTE CLAIMS

### A. Demand Required/Demand Excused

As a threshold matter, in assessing whether Plaintiffs' derivative claims brought on behalf of Disney survive Defendants' motion to dismiss, I must decide whether Plaintiffs are excused from making demand on the Disney Board before filing this lawsuit.[9] Under Aronson v.

9. See Ct. Ch. R. 23.1 ("In a derivative action brought by 1 or more shareholders ... [t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the

*Lewis,* demand is considered futile and, therefore, excused only if the particularized facts alleged in the complaint create a reasonable doubt that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment.[10] In deciding whether this test has been met, the Court will only consider well-pleaded allegations of fact and the reasonable inferences that can be drawn from them.[11] Therefore, if I am satisfied that a plaintiff has alleged facts with particularity that, if taken as true, support a reasonable doubt as to either aspect—self-interest or lack of careful business judgment—of the *Aronson* analysis, the futility of demand is established and my inquiry ends.[12]

Furthermore, under *Aronson*'s first prong—director independence—for demand to be futile, the Plaintiffs must show a reasonable doubt as to the disinterest of at least half of the directors.[13] The mere presence of a majority of interested board members is sufficient to excuse demand.

In order to create a reasonable doubt that a director is disinterested, a derivative plaintiff must plead particular facts to demonstrate that a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or, conversely, that "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."[14] In these situations, a director cannot be expected to act "without being influenced by the ... personal consequences" flowing from the decision.[15] At the other end of the spectrum, a board member is considered to be disinterested when he or she neither stands to benefit financially nor suffer materially from the decision whether to pursue the claim sought in the derivative plaintiff's demand.[16]

### B. First Prong Of Aronson—Independence and Absence of Self–Interest

In both the first and second counts of their amended complaint, Plaintiffs attack the former Board's decision to enter into the Employment Agreement.[17] Plaintiffs concede that they failed to make a demand on the Board regarding this issue, but argue that such demand would have been futile and, therefore, is excused. With respect to the first prong of the *Aronson* test, Plaintiffs offer several reasons for their assertion that the Board is not independent.[18] Chief among them is

---

directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

10. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

11. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988) ("[C]onclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true.").

12. *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624–25 (1984); *Aronson,* 473 A.2d at 814–15.

13. *See Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, at 21, Allen, C., 1995 WL 441999 (July 19, 1995) ("Where the facts alleged, if proven, would demonstrate that a majority of the directors who would have received the demand letter are 'interested' in the challenged transaction or 'lack independence' because of domination by an interested party or other-

wise, demand will be excused. In such an instance, the board is presumptively unable to produce the sort of business decisions that is accorded strong deference.").

14. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993).

15. *Id.*

16. *See id.* at 935.

17. As discussed earlier, the first count alleges that this decision constitutes a breach of the Board's fiduciary duties; the second count claims that this decision amounts to a waste of corporate assets.

18. Plaintiffs allege that the personal interrelationships among the directors somehow render the Director Defendants interested in the disputed transaction. Demand is not ex-

Plaintiffs' assertion that Eisner dominates and controls the Board. Plaintiffs argue that at least twelve of the fifteen members of the Disney Board who would have considered such a demand (*i.e.*, excluding Ovitz) had such strong ties to Eisner that they would not have been able to make an impartial decision with respect to any demand Plaintiffs may have made. In order to prove domination and control by Eisner, Plaintiffs must demonstrate first that Eisner was personally interested in obtaining the Board's approval of the Employment Agreement and, second, that a majority of the Board could not exercise business judgment independent of Eisner in deciding whether to approve the Employment Agreement.[19]

### 1. *Eisner's Alleged Interest in Ovitz's Compensation*

██ Plaintiffs offer two grounds for finding that Eisner was interested in the Employment Agreement. First, Plaintiffs suggest that Eisner's long-time personal relationship with Ovitz caused him to be interested in obtaining the Board's approval of the Employment Agreement. This argument, however, finds no support under Delaware law. The fact that Eisner has long-standing personal and business ties to Ovitz cannot overcome the presumption of independence that all directors, including Eisner, are afforded.[20]

██ Second, Plaintiffs allege that Eisner was interested because he wanted to maximize his own income from Disney. Plaintiffs explain that Eisner accomplished this objective by "(a) maximizing the payments made by Disney to Ovitz; and (b) minimizing, to the extent possible, the controversy surrounding Ovitz's severance pay."[21] According to Plaintiffs' theory, by providing his second-in-command a lucrative compensation package, Eisner set a high baseline from which he could negotiate upward for increased compensation for himself. Consequently, the argument goes, any public dispute with Ovitz would have conflicted with Eisner's desire to limit the criticism surrounding his own compensation package which was announced and submitted for shareholder approval shortly after Ovitz left the Company.

Plaintiffs' allegation that Eisner was interested in maximizing his compensation at the expense of Disney and its shareholders cannot reasonably be inferred from the facts alleged in Plaintiffs' amended complaint. At all times material to this litigation, Eisner owned several million options to purchase Disney stock. Therefore, it would not be in Eisner's economic interest to cause the Company to issue millions of additional options unnecessarily and at considerable cost. Such a gesture would not, as Plaintiffs suggest, "maximize" Eis-

cused, however, just because directors would have to sue "their friends, family and business associates." *Abrams v. Koether*, 766 F.Supp. 237, 256 (D.N.J.1991) (applying Delaware law).

Plaintiffs also allege that many of the directors are interested because they receive director fees and stock options. For example, non-management directors receive $30,000 a year, plus $1,000 for each Board or committee meeting that they attend. Under Delaware law, the receipt of such customary payments and benefits has been held insufficient to demonstrate any interest that might conflict with Disney's interest in the Employment Agreement. *See, e.g., Grobow*, 539 A.2d at 188.

19. *See Grobow*, 539 A.2d at 189 ("This would require plaintiffs to allege with particularity

... directors were dominated or otherwise controlled by an individual or entity interested in the transaction."); *Aronson*, 473 A.2d at 815 ("There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.").

20. *See, e.g., Green v. Phillips*, Del. Ch., C.A. No. 14436, Jacobs, V.C., 1996 WL 342093 (June 19, 1996), mem. op. at 10 (holding that the directors' longstanding personal and professional ties to the company's former chief executive officer and chairman of the board were not sufficient to overcome the directors' presumption of independence).

21. Am. Compl. ¶ 202.

ner's own compensation package. Rather, it would dilute the value of Eisner's own very substantial holdings. Even if the impact on Eisner's option value were relatively small, such a large compensation package would, and did, draw largely negative attention to Eisner's own performance and compensation. Accordingly, no reasonable doubt can exist as to Eisner's disinterest in the approval of the Employment Agreement, as a matter of law. Similarly, the Plaintiffs have not demonstrated a reasonable doubt that Eisner was disinterested in granting Ovitz a Non–Fault Termination, thus allowing Ovitz to receive substantial severance benefits under the terms of the Employment Agreement. Nothing alleged by Plaintiffs generates a reasonable inference that Eisner would benefit personally from allowing Ovitz to leave Disney without good cause.

### 2. *Eisner's Alleged Domination of the Board*

I turn now to the Disney directors whom Plaintiffs allege were under Eisner's control, to consider whether they could have exercised their business judgment independently of Eisner.

Plaintiffs aver that the following directors' individual ties to Eisner, coupled with their Board emoluments, create at least a reasonable doubt under *Aronson*'s first prong that the Disney Board would have honestly considered a demand in connection with the approval of the Employment Agreement and Ovitz's Non–Fault Termination. Plaintiffs must overcome the Delaware rule that "[s]peculation on motives for undertaking corporate action are [sic] wholly insufficient to establish a case of demand dismissal."[22] While the issues at times present close calls, ultimately I am not persuaded that the allegations with regard to nine of the following

twelve Board members survive under *Aronson*. Even if Plaintiffs had shown a reasonable doubt as to Eisner's disinterest in the Employment Agreement and Ovitz's Non–Fault Termination, that showing alone would not suffice. Based on *Aronson*, the fact that a majority of the Board (the above nine, plus three members not alleged to be interested or under the domination of Eisner) was able to exercise its business judgment independent of Eisner does not lead to an excusal of demand on the Board.

#### a. Disney, Litvack, and Nunis

Plaintiffs allege that directors Roy E. Disney, Sanford M. Litvack, and Richard A. Nunis were unable to exercise independent business judgment with respect to a demand because they were Disney executive employees who reported to and were accountable to Eisner at the time Plaintiffs commenced this litigation. I note at the outset the general Delaware rule that "the fact that they hold positions with the company [controlled by Eisner] . . . is no more disqualifying than is the fact that he designated them as directors."[23]

I begin my analysis with Mr. Disney, who earns a substantial salary and receives numerous, valuable options on Disney stock. As a top executive, his compensation is set by the Board, not solely by Eisner. Furthermore, Mr. Disney, along with his family,[24] owns approximately 8.4 million shares of Disney stock. At today's prices these shares are worth $2.1 billion. The only reasonable inference that I can draw about Mr. Disney is that he is an economically rational individual whose priority is to protect the value of his Disney shares, not someone who would intentionally risk his own and his family's interests in order to placate Eisner. Nothing in Plaintiffs' pleadings suggest that Mr. Dis-

---

**22.** *Grobow,* 539 A.2d at 188.

**23.** *Lewis v. Aronson,* Del. Ch., C.A. No. 6919, Hartnett, V.C., 1985 WL 11553 (May 1, 1985), mem. op. at 10–11.

**24.** Because this information is included in the proxy statement that Plaintiffs included with their amended complaint, it may be considered on this motion to dismiss.

ney would place Eisner's interests over Mr. Disney's own and over those of the Company in derogation of his fiduciary duties as a Disney director.

■■■■ With respect to Nunis and Litvack, contrary to Plaintiffs' allegations, these directors do not necessarily lose their ability to exercise independent business judgment merely by virtue of their being officers of Disney and Disney's subsidiaries.[25] Moreover, there is no merit in Plaintiffs' highly speculative[26] argument that Litvack and Nunis were interested in the Employment Agreement because they had a personal financial interest in establishing a heightened compensation level throughout the Company.[27] Plaintiffs, however, have pleaded with some particularity that there is at least a reasonable doubt as to Litvack and Nunis's ability to vote independently of Eisner. Their salaries are presumably also set by the Board, but they do not hold the same level of shares as Roy E. Disney and his family, and so there is a reasonable possibility they are more beholden to Eisner. Since, as a matter of law, Plaintiffs are unable to show a reasonable doubt as to Eisner's absence of self-interest, his potential domination over these two directors is inconsequential.

### b. Gold

■■■ Plaintiffs allege that director Stanley P. Gold similarly lacks independence from Eisner because, as Mr. Disney's personal attorney, and the president and chief executive officer of a company wholly-owned by Mr. Disney's family, he is beholden to Mr. Disney (who is allegedly controlled by Eisner).

While Gold may hold such positions under Roy E. Disney, because Mr. Disney's ability to exercise his independent business judgment is not impaired by his connection with Eisner, the business judgment of Gold is similarly free from Eisner's alleged dominating influence.

### c. Stern

■■■ Plaintiffs allege that director Robert A.M. Stern's financial dealings with Disney were sufficiently large to cast a reasonable doubt upon his ability to consider a demand disinterestedly. Plaintiffs point out that Stern, an architect, had been commissioned to design several buildings for the Company and one for Eisner, for which his firm had collected millions of dollars in fees from Disney and Eisner. Plaintiffs allege that because of these fees, Eisner controls Stern and there is a reasonable doubt as to whether Stern could consider a demand independent of Eisner's influence.

I agree with Plaintiffs: The fact that Stern's architectural firm has received, and perhaps continues to receive, payments from Disney over a period of years raises a reasonable doubt as to Stern's independent judgment with respect to the Employment Agreement.[28] A number of

---

**25.** *See supra* note 23 and accompanying text.

**26.** *See Grobow,* 539 A.2d at 188 ("Speculation on motives for undertaking corporate action are wholly insufficient to establish a case of demand excusal.").

**27.** This appears to be a variation on the unsuccessful argument Plaintiffs made with respect to their allegation that Eisner was interested in the Employment Agreement.

**28.** *See* Revised Model Business Corp. Act § 7.44(c) (1996) (implicitly allowing the consideration of a director as lacking independence when he or she is beholden to an interested party by not listing it among the three situations in which a director shall not be considered not independent); A.L.I. Principles of Corp. Governance § 1.23(a) (1994) (stating that a director is "interested" if that director "is subject to a controlling influence by a ... person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's ... judgment with respect to the transaction or conduct in a manner adverse to the corporation"). *But cf. Maldonado v. Flynn,* 597 F.2d 789, 794 (2d Cir.1979) (receipt of substantial attorney fees does not demonstrate lack of independence absent a claim that the director voted in exchange for some *quid pro quo* ); *Brickman v.*

factors affect my judgment. On the one hand, Plaintiffs admit that the fees that Stern's architectural firm have received are in decline, and that Eisner has gone on record stating that "Stern is unlikely to get new Disney contracts while on the Board." [29] Nevertheless, fees have continued to flow from Disney to Stern's firm, and the fees received in the past, from both Disney and Eisner, have been quite substantial. Thus, as a matter of law, Plaintiffs have shown a reasonable doubt that Stern is independent of Eisner.

#### d. Walker

■ Plaintiffs assert that director E. Cardon Walker could not exercise business judgment independent of Eisner because, after Eisner became chairman of Disney, Walker consulted for Disney and has, in recent years, received substantial sums for his investments in certain Disney films.[30]

Plaintiffs do not raise a reasonable doubt that Walker lacks independence from Eisner or is somehow interested in the Employment Agreement. Walker is a retired Disney executive. Plaintiffs do not allege that he has had any financial dealings with Eisner. As for the substantial sums Plaintiffs allege Walker has received and continues to receive from Disney, these stem from contractual rights with the Company that are at least nineteen years old and that predate Eisner's reign with Disney. Plaintiffs have failed to demonstrate that Walker is somehow beholden to Eisner or otherwise incapable of exercising independent judgment.

*Tyco Toys, Inc.*, 722 F.Supp. 1054, 1063–64 (S.D.N.Y.1989) (stating that while an attorney-client relationship "could motivate a director to act improperly, this possibility is not sufficient to overcome the presumption of independence which is observed by the Delaware courts"); *Tabas v. Mullane*, 608 F.Supp. 759, 768 (D.N.J.1985) (interpreting Delaware law to state that a relationship that generated over $4.6 million in legal fees for a law firm in which a director was a name partner was inadequate to demonstrate interest by the director without further allegations of improprieties).

#### e. Wilson

■ Plaintiffs allege that director Gary L. Wilson lacked independence from Eisner as well. Wilson served under Eisner as Disney's executive vice president and chief financial officer from July 1985 through December 1989, receiving substantial compensation from Disney over which, Plaintiffs' allege, Eisner had considerable influence. Plaintiffs also assert that Wilson is beholden to Eisner because Eisner, by virtue of his authority as chairman, rewarded Wilson handsomely when the latter retired from Disney. Finally, Plaintiffs allege that Wilson's independence is further compromised because in 1995 Disney paid $121,122 to a design firm owned by Wilson's wife.

Plaintiffs' claims do not raise a reasonable doubt that Wilson is interested in the Employment Agreement. Whatever rights Wilson had when he left Disney have already been paid to him. Nothing indicates that Wilson expects to receive additional financial benefits from Disney for acceding to Eisner's wishes in connection to the Employment Agreement. Nor have Plaintiffs alleged particularized facts that would lead one to infer that Wilson is beholden to Eisner. The $121,122 payment to Wilson's wife's design firm for services performed is immaterial to Wilson, a man who received a bonus and stock options that, by Plaintiffs' own estimations, have resulted in over $70 million in income realized so far.[31]

**29.** Am. Compl. ¶ 226 (quoting Eisner from an article in the May 2, 1994, issue of *Business Week*).

**30.** Walker was a senior executive of Disney for 25 years, serving as Disney's president from 1971 to 1977 and chairman of the board and chief executive officer from 1980 to 1983.

**31.** *See* Pls.' Br. Opp'n. to Defs.' Mots. to Dismiss at 26 n. 28.

#### f. O'Donovan

■ Plaintiffs also allege that Father Leo J. O'Donovan, involved only in the decision to honor the Employment Agreement, is incapable of rendering independent business judgment. O'Donovan is the president of Georgetown University, the *alma mater* of one of Eisner's sons and the recipient of over $1 million of donations from Eisner since 1989. Accordingly, Plaintiffs allege that O'Donovan would not act contrary to Eisner's wishes.

The closest parallel to O'Donovan's situation faced by this Court occurred in *Lewis v. Fuqua*.[32] Any reliance by Plaintiffs on that case, however, would be misplaced. In *Lewis*, the allegedly disinterested director, Sanford, was the President of Duke University. Duke was the recipient of a $10 million pledge from the dominant board member, Fuqua. Nevertheless, several differences exist that serve to distinguish that matter from the present one. First and foremost, Sanford had "numerous political and financial dealings" with Fuqua,[33] while Plaintiffs here have not alleged any such relationship between Eisner and O'Donovan. Secondly, Fuqua and Sanford served as directors together both on the Board whose actions were being challenged and on the Duke University Board of Trustees. Such an interlocking directorship, a situation that would likely lead to a reasonable doubt of O'Donovan's independence,[34] does not exist here, as Eisner has no formal relationship with Georgetown University.[35] These two differences are sufficient to demonstrate that *Lewis* does not apply here.

The question, then, is whether Eisner exerted such an influence on O'Donovan that O'Donovan could not exercise independent judgment as a director. Plaintiffs do not allege any personal benefit received by O'Donovan—in fact, they admit that O'Donovan is forbidden, as a Jesuit priest, from collecting any director's fee. Plaintiffs cite the case of *Kahn v. Tremont Corp.*[36] "Eisner's philanthropic largess to Georgetown is no less disqualifying than the financial arrangements enjoyed by the special committee members in *Kahn*."[37] In that case, however, two of the three special committee members received a direct, personal financial benefit from their affiliation with the interested party, and the third sought membership on the boards of other entities controlled by the interested party.[38] The distinction between *Kahn* and this matter then is clear, and I do not believe that Plaintiffs have presented a reasonable doubt as to the independence of O'Donovan.

#### g. Bowers

■ Director Reveta F. Bowers is the principal of the elementary school that Eisner's children once attended. Plaintiffs suggest that because Bowers' salary as a teacher[39] is low compared to her director's fees and stock options, "only the most rigidly formalistic or myopic analysis"[40] would view Bowers as not beholden to Eisner.

---

**32.** Del.Ch., 502 A.2d 962 (1985).

**33.** *Id.* at 966.

**34.** *See Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1063 (S.D.N.Y.1989) (stating a reasonable doubt as to the independence of a director is created where that board member was an officer and director of several companies in which a controlling director had an interest).

**35.** *See Lewis*, 502 A.2d at 967 (describing Fuqua as a Trustee of Georgetown).

**36.** Del.Ch., C.A. No. 12339, Allen, C., 1994 WL 162613 (Apr. 21, 1994, *revised* April 22, 1994).

**37.** Pls.' Br. Opp'n to Defs.' Mots. to Dismiss at 30.

**38.** *Kahn v. Tremont Corp.*, C.A. No. 12339, at 3–4, 1994 WL 162613.

**39.** Actually, she is the principal.

**40.** Pls.' Br. Opp'n to Defs' Mots. to Dismiss at 30.

Plaintiffs fail to recognize that the Delaware Supreme Court has held that "such allegations [of payment of director's fees], without more, do not establish any financial interest." [41] To follow Plaintiffs' urging to discard "formalistic notions of interest and independence in favor of a realistic approach" [42] expressly would be to overrule the Delaware Supreme Court.

Furthermore, to do so would be to discourage the membership on corporate boards of people of less-than extraordinary means. Such "regular folks" would face allegations of being dominated by other board members, merely because of the relatively substantial compensation provided by the board membership compared to their outside salaries. I am especially unwilling to facilitate such a result. Without more, Plaintiffs have failed to allege facts that lead to a reasonable doubt as to the independence of Bowers.

### h. Mitchell

Plaintiffs question the independence of Senator George J. Mitchell. Mitchell acts as special counsel to a law firm that has been engaged by Disney on various matters and that was paid $122,764 for its services in 1996. Disney has also retained Mitchell on an individual basis to provide consulting services to the Company. Plaintiffs allege that during 1996, Disney paid Mitchell $50,000 for performing these services. Accordingly, Plaintiffs allege that Mitchell is incapable of making business decisions independently of Eisner.

First, Plaintiffs have not indicated that Mitchell, as "special counsel" (and not "partner") shared in the legal fees paid to his firm. Second, Plaintiffs have not alleged that the $50,000 in consulting fees was even material to Mitchell, a nationally known legal and political figure. Plaintiffs have not alleged any particularized facts that raise a reasonable doubt that Mitchell voted in favor of the Employment Agree-

ment in order to obtain a specific financial benefit. Without such allegations, Plaintiffs' conclusory assertion that Mitchell was under Eisner's influence or otherwise interested in any aspect of the Employment Agreement is insufficient as a matter of law to raise a reasonable doubt as to Mitchell's independence.

### i. Russell

Director Irwin E. Russell is an entertainment lawyer who serves as Eisner's personal counsel and has a long history of personal and business ties to Eisner. As a result, Plaintiffs allege Russell is unable to exercise independent business judgment.

In addition to being Eisner's personal counsel: Russell's law office is listed as the mailing address for Eisner's primary residence; Russell is the registered agent for several entities in which Eisner is involved; Russell has represented Eisner in connection with Eisner's negotiation of the Eisner Compensation Agreement in 1996 and early 1997 (during which negotiation he recused himself from his Board role); and, Plaintiffs assert, Russell practices in a small firm for which the fees derived from Eisner likely represent a large portion of the total amount of fees received by the firm. Accordingly, it appears Plaintiffs have raised a reasonable doubt as to Russell's independence of Eisner's influence for the purpose of considering a demand.

### 3. Poitier's Alleged Interest in Ovitz's Compensation

As for director Sidney Poitier, Plaintiffs do not allege that he is dominated by Eisner. Plaintiffs do allege, however, that Poitier is a longtime client of Creative Artists Agency—the talent agency that Ovitz founded—and through his relationship with CAA, he has earned millions of dollars. As a result, Plaintiffs suggest Poitier is "impermissibly conflict-

---

41. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 (1988).

42. Pls.' Br. Opp'n to Defs.' Mots. to Dismiss at 29.

ed" in his ability to render independent business judgment with respect to Ovitz's compensation.[43]

Although Poitier had enjoyed a successful relationship with Ovitz and CAA, (a) Ovitz is no longer the head of CAA, and (b) it does not follow that Poitier is incapable of considering Ovitz's compensation package without bias. Such an assertion is based on conjecture, and Plaintiffs have not raised a reasonable doubt as to Poitier's independence. My judgment might be otherwise if Poitier continued to receive material benefits from CAA and Ovitz was concurrently involved with that firm.

#### 4. Conclusions

In sum, Plaintiffs have not raised a reasonable doubt as to the absence of self-interest of any of the directors in approving or honoring the Employment Agreement. If, however, Plaintiffs had shown a reasonable doubt on Eisner's part, then I would agree that they had demonstrated a reasonable doubt as to the independence only of directors Litvack, Nunis, Stern, and Russell, because of Eisner's domination over them. Plaintiffs have not raised a reasonable doubt as to the independence from Eisner of directors Disney, Gold, Walker, Wilson, O'Donovan (involved only in the decision to honor the Employment Agreement), Bowers, Mitchell, and Poitier. Plaintiffs have not questioned the independence of directors Lozano, Murphy (involved only in the decision to honor the Employment Agreement), Watson, and Bollenbach (involved only in the decision to approve the Employment Agreement).

 Thus, even assuming that Eisner was interested in the Employment Agreement—and, again, Plaintiffs have *not* shown a reasonable doubt as to Eisner's independence—Plaintiffs still come up short; ten of the fifteen directors who approved the Agreement and eleven of the sixteen who voted to honor the Agreement were independent in deciding the issues of Ovitz's compensation *and* free of domination from Eisner. Accordingly, demand is not excused under the first prong of *Aronson* with respect to the first two counts of Plaintiffs' amended complaint.

#### C. Second Prong of Aronson Test— Business Judgment

I now turn to the second prong of *Aronson*. The inquiry here is whether a reasonable doubt is created that the Director Defendants' "challenged transaction was otherwise the product of a valid exercise of business judgment."[44] In other words, demand will be excused if Plaintiffs' allegations raise a reasonable doubt that the Board was well-informed, careful and rational in approving the Employment Agreement or granting Ovitz's Non–Fault Termination.

#### 1. The Former Board's Approval of the Employment Agreement

##### a. Breach of Fiduciary Duties

With regard to the alleged breach of the duty of care, Plaintiffs claim that the directors were not properly informed before they adopted the Employment Agreement because they did not know the value of the compensation package offered to Ovitz. To that end, Plaintiffs offer several statements made by Graef Crystal, the financial expert who advised the Board on the Employment Agreement, including his admission that "[n]obody quantified [the total cost of the severance package] and I wish we had."[45]

 The fact that *Crystal* did not quantify the potential severance benefits to Ovitz for terminating early without cause (under the terms of the Employment Agreement) does not create a reasonable

43. Am. Compl. ¶ 219.

44. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

45. Am. Compl. ¶ 143 (quoting Crystal in the January 13, 1997 edition of *California Law Business).*

inference that *the Board* failed to consider the potential cost to Disney in the event that they decided to terminate Ovitz without cause. But, even if the Board did fail to calculate the potential cost to Disney, I nevertheless think that this allegation fails to create a reasonable doubt that the former Board exercised due care. Disney's expert did not consider an inquiry into the potential cost of Ovitz's severance benefits to be critical or relevant to the Board's consideration of the Employment Agreement. Merely because Crystal *now* regrets not having calculated the package is not reason enough to overturn the judgment of the Board *then*. It is the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board's decision, except "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment."[46] Because the Board's reliance on Crystal and his decision not to fully calculate the amount of severance lack "egregiousness," this is not that rare case. I think it a correct statement of law that the duty of care is still fulfilled even if a Board does not know the exact amount of a severance payout but nonetheless is fully informed about the manner in which such a payout would be calculated. A board is not required to be informed of every fact, but rather is required to be reasonably informed. Here the Plaintiffs have failed to plead facts giving rise to a reasonable doubt that the Board, as a matter of law, was reasonably informed on this issue.

### b. Waste

■■■■■ Plaintiffs also allege that the Board's approval of the Employment Agreement constitutes waste. Under well-settled Delaware law, directors are only liable for waste when they "authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[47] It has likewise been noted that, in the absence of fraud, this Court's deference to directors' business judgment is particularly broad in matters of executive compensation.[48] Therefore, if a "particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment."[49]

■■■■ Here, the former Board determined that in order to attract Ovitz to Disney, Disney would have to offer him a highly attractive compensation package. This they did. In exchange for providing Ovitz the compensation package under the terms of the Employment Agreement, Ovitz agreed to leave his position as chairman of CAA to become president of Disney. Ovitz served in this capacity for approximately fourteen months.

As for Plaintiffs' allegation that the terms of the Employment Agreement were structured to provide Ovitz a disincentive to remain at Disney, again I disagree. The Employment Agreement contained a vesting schedule pursuant to which one million of Ovitz's stock options would vest each year. Surely these stock options offered an incentive for Ovitz to remain at Disney in good standing for the term of the Employment Agreement. Plaintiffs contend that any such incentive was illusory because the Employment Agreement allowed Ovitz to receive three million options upon his departure from Disney under the terms of his Non–Fault Termination. But the decision to grant Ovitz the three million options upon his separation from Disney lay solely with the Disney Board, *not* with Ovitz. Ovitz could not choose to leave without the Board's ap-

---

**46.** *Aronson,* 473 A.2d at 815.

**47.** *Glazer v. Zapata Corp.,* Del. Ch., 658 A.2d 176, 183 (1993).

**48.** *See, e.g., Haber v. Bell,* Del. Ch., 465 A.2d 353, 359 (1983).

**49.** *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1215 (1996).

proval and still receive the options. Because Ovitz did not have control over whether he would receive these options, they could not serve as a disincentive for Ovitz to remain at Disney.

Furthermore, by leaving Disney before the completion of his five-year contract, Ovitz left *two million options* on the table. Clearly, the forfeiture of two million options to purchase Disney stock provided a substantial disincentive for Ovitz to leave Disney before the end of his five-year term. In short, I simply do not agree with the Plaintiffs' characterization of the exchange between Ovitz and Disney as so one-sided that no businessperson of ordinary, sound judgment could conclude that Disney received adequate consideration. In this light, the terms of the Employment Agreement do not constitute waste, and the Board's decision to approve the Agreement did not violate their fiduciary duties. Because Plaintiffs have failed to allege particularized facts to create a reasonable doubt that the former Board's decision to approve the Employment Agreement was the product of an exercise of the Board's business judgment, demand is not excused. Plaintiffs' claims in connection with the Board's decision to approve the Employment Agreement must be dismissed.

### 2. *The Current Board's Decision To Grant Ovitz the Non– Fault Termination*

Sometime during Ovitz's tenure at Disney, the current Board determined that it would not be in Disney's best interest for Ovitz to remain as Disney's president. Thus, the Board elected to grant Ovitz a Non–Fault Termination (under the terms of the Agreement). Plaintiffs argue that this decision was not only wasteful, but also a breach of the Board's fiduciary duties because the Director Defendants had good cause to terminate Ovitz or at least dispute any payments under the severance provisions of the Agreement.

Plaintiffs offer as grounds for this argument that Ovitz, while under contract with Disney: (1) actively searched for alternate employment; (2) sought to establish a new business that would compete with Disney; (3) performed services for or on behalf of CAA, particularly in connection with attempting to convince high profile clients to remain with CAA; (4) effectively resigned from his position as president *before* the Board granted his Non–Fault Termination; and (5) performed his duties in a grossly deficient manner.

In support of their contention that Ovitz effectively resigned from Disney prior to the Board's decision to grant him a Non–Fault Termination, Plaintiffs make the following two allegations. First, they allege that on September 5, 1996, Ovitz wrote a letter to Eisner in which Ovitz stated that he was very dissatisfied with the role he had been assigned at Disney and wanted to leave the Company.[50] Second, Plaintiffs allege that, as early as September 12, 1996, it was reported that Ovitz was actively seeking other employment.

■ The terms of the Employment Agreement limit "good cause" for terminating Ovitz's employment to gross negligence or malfeasance, or a voluntary resignation without the consent of the Company. I have reviewed the amended complaint and listened to the parties' arguments at the hearing in connection with Defendants' motions to dismiss. Still, I am unable to conclude that any of the facts alleged by Plaintiffs, even accepted as true, demonstrate that Ovitz's conduct was either grossly negligent or malfeasant during his tenure at Disney, or that Ovitz resigned voluntarily. For example, Plaintiffs allege that Ovitz sought alternative employment while he was the president of Disney. But Plaintiffs fail to explain how looking for another job constitutes gross negligence or malfeasance. The same holds true for Plaintiffs' allegation that Ovitz failed to follow Eisner's directive to meet with Di-

---

50. Am. Compl. ¶ 7.

rector Defendant Stephen F. Bollenbach, who was then the senior executive vice president and chief financial officer of Disney. This allegation may demonstrate that Ovitz failed to become familiar with Disney's finances or that he bucked authority at Disney. However, it does not demonstrate, without more, that Ovitz was grossly negligent or committed malfeasance. None of Plaintiffs' allegations rise to the level of gross negligence or malfeasance.

As for Plaintiffs' contention that Ovitz actually or impliedly tendered his resignation before the Board approved the Non–Fault Termination, I do not believe this conclusion can reasonably be drawn from the facts alleged by Plaintiffs. While I would agree that Ovitz's September 5 letter to Eisner and his search for another job provide strong evidence of Ovitz's lack of commitment to the Company, they are not legally tantamount to a voluntary resignation.

All that remains are Plaintiffs' unadorned arguments that Ovitz breached his employment contract with Disney. Plaintiffs have not alleged that the Board failed to consider whether Ovitz breached his contract, or how this alleged breach should be resolved. Instead, Plaintiffs merely argue that, in light of Ovitz's alleged *per se* breach, the directors' decision to grant Ovitz a Non–Fault Termination violated their fiduciary duties and resulted in corporate waste.

Based on the facts alleged, it is clear to me that the Board had several options in deciding how to handle Ovitz's alleged breach. For example, the Board might have done nothing and allowed Ovitz to continue to serve as president for the five-year term of his contract. Even Plaintiffs admit this was not a good idea. Alternatively, the Board might have terminated Ovitz for good cause and, in the process, exposed Disney to the risk and expense of a protracted court battle. The Board might have sued Ovitz for breach of contract. This, too, could have exposed Disney to various risks, including the nuisance of having to defend a countersuit brought by Ovitz. Finally, the Board might have granted Ovitz a Non–Fault Termination and paid him the severance benefits for which he had bargained under the terms of the Employment Agreement.

The Board made a business decision to grant Ovitz a Non–Fault Termination. Plaintiffs may disagree with the Board's judgment as to how this matter should have been handled. But where, as here, there is no reasonable doubt as to the disinterest of or absence of fraud by the Board, mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste. There is no allegation that the Board did not consider the pertinent issues surrounding Ovitz's termination. Plaintiffs' sole argument appears to be that they do not agree with the course of action taken by the Board regarding Ovitz's separation from Disney. This will not suffice to create a reasonable doubt that the Board's decision to grant Ovitz a Non–Fault Termination was the product of an exercise of business judgment. As demand is not excused as to Plaintiffs' claims in connection with the current Board's decision to grant Ovitz's Non–Fault Termination, these claims must be dismissed.[51]

### D. Conclusions

Under Court of Chancery Rule 23.1, Plaintiffs were required to either make a demand on the Board, which they did not do, or to allege particularized facts that excuse such demand in order to maintain the present derivative action. With regard

51. In addition to Plaintiffs' failure to make a demand on the Board, Defendants cite additional grounds upon which I could dismiss these claims, including the failure to state a claim upon which relief could be granted. Because I find that Plaintiffs' failure to satisfy demand requirements of Court of Chancery Rule 23.1 disposes of the issue, however, I need not reach these additional grounds for dismissal.

to the claims of breach of fiduciary duty and waste by the Defendant Directors in the Board's decision to approve and then honor Ovitz's Employment Agreement, the Plaintiffs have failed this requirement. Under the first prong of the *Aronson* test, the plaintiffs have not raised reasonable doubt as to the absence of self-interest among a majority of the Board. Under the *Aronson* test's second prong, the Plaintiffs have failed to create a reasonable doubt that the Board's decisions to approve the Employment Agreement or to grant Ovitz a Non–Fault Termination was a product of the Board's business judgment. As such, Plaintiffs claims of breach of fiduciary duty and waste must be dismissed.

## VI. THE DISCLOSURE CLAIM

Plaintiffs allege two failures by the current Director Defendants to disclose purportedly material facts before solicitation of shareholder approval for the five directors' re-election, the Eisner Compensation Plan, and the Bonus Plan. The first claim deals with the Board's alleged failure to disclose the effects of certain accounting changes as they relate to executive compensation. The second claim deals with the Board's alleged failure to make corrective disclosures once certain information related to the Ovitz termination was released.

### A. Plaintiffs' Allegations

Specifically, the first disclosure claim alleges that Disney failed to inform shareholders that the current Director Defendants could easily manipulate (and had manipulated) Disney's new methodology for calculating bonuses, based on Earnings Per Share ("EPS"), to inflate executive bonuses. Further, Plaintiffs claim that the current Director Defendants failed to inform shareholders of what Plaintiffs see as a harmful cycle of stock option exercises by executives and Disney's concurrent stock repurchases. Although the EPS and repurchase issues would appear to be discrete, Plaintiffs claim that they are interrelated because (1) the repurchases offset dilution caused by exercise of the executive stock options; (2) the repurchases inflate executive bonuses by reducing the denominator used in EPS-based bonus calculations; and (3) taken together the option exercises and stock repurchases drain Disney's net worth, but Defendants prevent this "loss" from reducing their bonuses by using the EPS methodology. Plaintiffs divide their "EPS Manipulation and Stock Repurchase" claim into the following discrete allegations:

(a) the EPS measure utilized to calculate bonuses under the Bonus Plan and Eisner's Compensation Agreement was inherently subject to [accounting] manipulation in the manner alleged in detail [in the complaint] above;

(b) defendants had facilitated such manipulation by employing stock repurchases and purchase accounting and substantial asset write-downs in connection with the Company's acquisition of Capital Cities;

(c) those accounting measures would have the effect of inflating the bonuses paid to Eisner and other Disney executives under the Bonus Plan and the Eisner Compensation Agreement;

(d) Disney had used stock repurchases in the past for the purpose of offsetting the dilutive effect of stock option exercises by Disney executives; and

(e) when the Company engaged in repurchases for that purpose, Disney suffered a direct financial loss because the proceeds collected by the Company were significantly smaller than the amounts paid by the Company to repurchase stock.[52]

Secondly, Plaintiffs allege that Eisner's misleading answer to shareholder questions about the Ovitz termination at the 1997 annual shareholder meeting invoked a

52. Am. Compl. ¶ 282.

duty to clarify his statements. Eisner characterized his decision to employ Ovitz: "I'd like to think this mistake thing does not apply to me . . . . But, in the office, it happens, as in the Ovitz situation. Not good. A mistake. Won't happen again."[53] Furthermore, he described Ovitz's termination benefits as mandated. "Because he did not make it at our company, *we had to* [give Ovitz the severance payments]."[54] Plaintiffs allege that these statements were incomplete and misleading because Eisner and Ovitz chose to ignore the grounds for terminating Ovitz *with* cause and caused Disney to terminate him *without* cause—making Ovitz eligible for the princely severance payments discussed earlier. Therefore, they allege that Eisner's statement that Disney had to pay was misleading and invoked a duty to clarify that misinformation. According to Plaintiffs, that duty to clarify (the "Ovitz termination clarification") required the current Director Defendants to specifically disclose that:

(a) Ovitz indicated, *in a letter written to Eisner on or about September 4, 1996,* that he wished to end his employment at Disney;

(b) Eisner, when approached by Ovitz, had unilaterally determined to treat Ovitz's resignation from Disney as a Non–Fault Termination under the Ovitz Employment Agreement (a decision the current Director Defendants acquiesced to), thereby triggering the exorbitant severance payments referred to above; and

(c) Ovitz breached the terms of the Ovitz Employment Agreement by, *inter alia,* actively seeking alternative employment during his tenure at Disney, providing services on behalf of CAA and performing his duties as Disney's president in a grossly deficient manner.[55]

## B. The Duty to Disclose

While it is true that the duty of disclosure is well established in Delaware fiduciary law, the breadth of its application and the scope of damages available for its breach have sparked much controversy. In its earliest appearances, the duty to disclose arose in the context of shareholder ratification of management's self-interested dealings, within the context of burden-shifting under our business judgment rule.[56]

Delaware's fiduciary law presumes that, in the normal course, directors of a Delaware corporation conduct board affairs with a focus on the best interests of the corporation.[57] In line with the presumption, this Court grants deference to directors' decisions.[58] This presumption, the business judgment rule, flows from 8

**53.** Am. Compl. ¶ 193.

**54.** Am. Compl. ¶ 194.

**55.** Am. Compl. ¶ 283.

**56.** *See, e.g., Cahall v. Lofland,* Del. Ch., 114 A. 224, 234 (1921); *see also* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty,* 49 *Vand. L.Rev.* 1087, 1112 (1996) ("The first and oldest instance in which the courts have invoked fiduciary duties as a basis for a director disclosure duty is the unwavering requirement of disclosure of material facts where corporate fiduciaries solicit and rely upon stockholder consent to a transaction between the fiduciary and the corporation.") (citing *Cahall* ).

**57.** *See Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984) (stating business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interest of the company.").

**58.** *See* Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared,* 44 Bus. Law 503, 522 (1989) ("There is a very simple explanation for the limitation on judicial review inherent in the business judgment rule. As Arrow points out, 'If every decision of A is to be reviewed by B, then all we have really is a shift in the locus of authority from A to B and hence no solution to the original problem.' The power to hold to account is the power to interfere and, ultimately, the power to decide. If stockholders are given too easy access to courts, the effect

*Del. C.* § 141(a) which codifies the principle that the board of directors is charged with managing the corporation's business and affairs.[59] Embedded in the rule is the requirement that the directors carry out their duties with due care and do not let personal interests, which may diverge from those of the corporation, guide their decisionmaking.[60] For example, where a shareholder proves that the board approved a transaction in which directors or the corporation's officers stood on both sides of the deal, thereby calling into doubt the satisfaction of the duty of loyalty, the presumption of the business judgment rule is rebutted.[61] This Court will acknowledge the potential breach of the duty of loyalty by subjecting the underlying transaction to the scrutiny of the exacting—but not outcome-determinative—entire fairness standard of review.[62]

 Entire fairness is composed of a two-prong inquiry into the transaction that seeks to determine whether it was fair both in price and in dealing.[63] Instead of imposing *per se* liability for board members who approve a self-interested transaction, this Court and the Delaware statutes recognize that in certain circumstances the shareholders may be well served notwithstanding the fact that the deal might be characterized as an interested transaction.[64] Therefore, this Court will permit a deal potentially tainted by the Board's self-interest to go forward, if it passes muster under entire fairness review.[65] Compared to an arbitrary *per se* rule, entire fairness review allows a more flexible judicial inquiry into the propriety of a board's approval of a potentially interested transaction.

 In addition to examining the substantive terms of a transaction, this Court recognizes that the shareholders themselves are often in the best position to judge the merits of a deal even when it is

is to transfer decisionmaking power from the board to the stockholders . . . .").

59. *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872 (1985).

60. *See Van Gorkom,* 488 A.2d at 872–73 ("Since a director is vested with the responsibility for the management of the affairs of the corporation, he must execute that duty with the recognition that he acts on behalf of others. Such obligation does not tolerate faithlessness or self-dealing . . . . Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information of the type and under the circumstances present here. Thus, a director's duty to exercise an informed business judgment is in the nature of a duty of care, as distinguished from a duty of loyalty." (citations omitted)).

61. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (stating "judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries.").

62. *See, e.g., Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1376 (1993) (explaining that the court's decision to apply entire fairness stan-

dard of review invokes a standard so exacting that it frequently, but not always, results in a finding of liability).

63. *See, e.g., Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 711 (1983) ("The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.").

64. For instance, a merger with a majority shareholder at a price well above the current market value for the company's shares. *See, e.g., Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985) (affirming Chancery Court's finding that parent-subsidiary merger was fair to subsidiary's minority shareholders).

65. *See, e.g., Citron v. E.I. Du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490 (1990) (finding parent negotiated fair exchange ratio for shares of minority shareholders in subsidiary).

tainted by board self-interest. Thus, this Court acknowledges the role of shareholder ratification in self-interested deals: [66] Where management seeks and receives approval of a self-interested transaction from a majority of disinterested shareholders, this Court will defer to the shareholders' endorsement.

In the context of disinterested shareholder ratification of a deal between the corporation and a majority shareholder, the trial court's deference manifests itself as a shift in the burden of persuasion under the entire fairness standard from the defending directors, who normally must bear the burden, to the plaintiff shareholder, who must now show that the transaction was somehow unfair.[67] The underlying rationale: Since the shareholders—the constituency whose economic interests are at risk—approved a transaction tainted by board self-interest, as complainants they must bear the burden of showing why this Court should step in and protect the shareholders against a deal for which they already have voiced their approval.

I must note that because of 8 *Del. C.* § 144(a)(2), where the interested transaction is between the corporation and a director or his affiliate(s), rather than the majority shareholder, shareholder ratification does not shift the burden of persuasion to the plaintiff under entire fairness.[68] As against the plaintiffs, the impact is more powerful than that: Section 144(a)(2) provides that no contract or transaction between a corporation and its director (or director's affiliate) shall be void or voidable if the "material facts as to his [the director's] relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders."[69] Section 144 codifies the rule that shareholders may ratify an interested transaction with the corporation's directors, expressly conditioning the validity of that ratification upon the Board's full disclosure of all material facts.[70] The statute goes a step further than burden shifting, adding that if a transaction with a director is ratified, it is neither void nor voidable.[71] Therefore, our courts have treated fully informed shareholder ratification under § 144(a)(2) as validating the transaction and removing it from the purview of entire fairness review.[72] The business judgment rule applies to the ratified transaction, and to rebut its presumption, the plaintiff must allege facts showing that no person of ordinary sound business judgment could view the benefits received as a fair exchange for the consideration paid by the corporation, *i.e.*, the

---

66. *See, e.g., In re Wheelabrator,* Del. Ch., 663 A.2d 1194, 1202–04 (discussing doctrinal basis for shifting burden of persuasion to plaintiff where a transaction with majority shareholder was ratified by minority shareholders).

67. *See Rosenblatt,* Del.Supr., 493 A.2d at 937 (1985) (holding that "approval of a merger, as here, by an informed vote of a majority of the minority shareholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the merger entirely to the plaintiffs").

68. *See In re Wheelabrator,* Del. Ch., 663 A.2d at 1204 (stating that approval of transaction under § 144(a)(2) invokes business judgment rule and limits judicial review to issues of gift or waste, with the plaintiff bearing the burden of persuasion).

69. 8 *Del. C.* § 144(a)(2).

70. In other words, it codifies the board's duty of disclosure as a prerequisite to obtaining shareholder ratification of interested deals involving a director. *See Marciano v. Nakash,* Del.Supr., 535 A.2d 400, 405 n. 3 (1987).

71. *See* 8 *Del. C.* § 144(a).

72. *See In re Wheelabrator,* Del. Ch., 663 A.2d at 1203 (holding "8 *Del. C.* § 144(a)(2) pertinently provides that an 'interested' transaction of this kind will not be voidable if it is approved in good faith by a majority of disinterested stockholders").

transaction amounts to corporate waste.[73] Therefore, if ratification under § 144(a)(2) cloaks the board's decision with the protection of the business judgment rule, the plaintiff must capture in its pleadings the formidable yet elusive elements of an action for corporate waste in order to pierce that shield. Otherwise, the claim must be dismissed.[74]

■ Although the impact of shareholder ratification differs between interested majority shareholder and interested director cases, in either case there arises an identical prerequisite to ratification—the duty to disclose. To obtain this Court's deference to shareholder ratification, directors and majority shareholders alike must show this Court that the shareholders possessed all information germane to the transaction at the time they voted to ratify it.[75] Where a board seeks shareholder action, it is charged with the obligation to provide shareholders with the requisite information.[76] If shareholders' understandable ignorance persists, it is likely that a disloyal board's actions could remain hidden from this Court's scrutiny.[77] Thus, in its earliest form, the duty of disclosure was the simple requirement that a board seeking shareholder ratification of a self-interested transaction provide shareholders all information material to the transaction. The duty existed and still exists as an essential component of the duty of loyalty in a situation where the board seeks to comply with its fiduciary obligations by obtaining shareholder approval for the board's otherwise potentially conflicted interests.

■ The recognized usefulness of information has pushed disclosure into a far more central role. The duty of disclosure is now recognized whenever the Board seeks shareholder action, regardless of whether the approval sought is for an act or transaction in which the board itself is conflicted.[78] Far from being seen as a mere additional burden, corporations may seize the power of fully informed shareholder approval as a sort of safe harbor.

The increase in importance of the duty of disclosure has taken place in conjunction with the expanded role of the duty of care in Delaware's corporate jurisprudence. Two seminal cases best illustrate that development. First, in *Smith v. Van Gorkom*,[79] the Supreme Court held that the independent and disinterested directors of Trans Union Corporation breached their fiduciary duty of care by hastily approving a transaction about which they possessed

73. *See id.* at 1203 (noting high standard for pleading a claim of waste where a transaction is protected by the business judgment rule).

74. *See, e.g., Grobow v. Perot*, Del.Supr., 539 A.2d 180, 192 (1988) ("We hold that the complaints as amended fail to allege facts sufficient to create a reasonable doubt that the GM Board-approved repurchase transaction is not within the protection of the business judgment rule.... The Trial Court, therefore, correctly dismissed the suits under Del. Ct. Ch. R. 23.1 for failure of plaintiffs to make pre-suit demand upon the GM Board.").

75. *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 893 (1985) ("The burden must fall on defendants who claim ratification based on shareholder vote to establish that the shareholder approval resulted from a fully informed electorate.").

76. *See Cahall v. Lofland*, Del. Ch., 114 A. 224, 234 (1921) ("One cannot ratify that which he does not know. The burden is on him who relies on a ratification to show that it was made with a full knowledge of all material facts.").

77. *See Van Gorkom*, 488 A.2d at 890–92 (finding that by failing to disclose facts and showing hasty careless approval of merger by its members from shareholders, the board breached its duty to disclose.).

78. *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (1996) ("It is well-established that the duty of disclosure 'represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.' This duty inheres any time a corporate board of directors seeks stockholder action." (citation omitted)).

79. Del.Supr., 488 A.2d 858 (1985).

only superficial information.[80] That breach of the duty of care was compounded by the board's failure to inform shareholders of its improvident approval of the deal when it sought their ratification. In other words, information about the process was lacking. The *Van Gorkom* Court thus held that the board had a duty of disclosure in a situation where the underlying transaction did not implicate the duty of loyalty. The decision was controversial because it awarded damages based upon the board's breach of the duty of care. What passed relatively unnoticed[81] was the fact that this Court did not stop at nullifying shareholder ratification of the deal because of the board's material nondisclosure, but found that the nondisclosure itself constituted an independent breach of fiduciary duty for which damages might be awarded.[82]

This expansion of disclosure duties to cover all board solicitations of shareholder approval, continued in *Zirn v. VLI Corp.*[83] The plaintiff in *Zirn I* claimed that the VLI board committed two breaches of the duty to disclose in its materials soliciting shareholder approval of VLI's negotiated, arms-length merger with American Hospital Corporation ("AHC"). Among other claims, the plaintiff alleged that the merger had been renegotiated because of the impact of the October 19, 1987, stock market crash,[84] and that the board failed to disclose this material factor.[85] The record showed that VLI had agreed to a renegotiated price (from $7/share to $6.25/share) and structure (a change from a merger to a tender offer/merger) fifteen days after the market crash, but the trial court held that because the VLI board did not consider the drop in stock markets an important factor in renegotiating the deal with AHC, the board was under no duty to disclose it.[86] The Supreme Court reversed the trial court, holding that the materiality of the market crash stemmed not from the significance given it by the VLI board, but from the weight given it by a hypothetical "reasonable investor."[87]

What appeared troubling to some about the increasing importance of the duty of disclosure was that it appeared to be growing in two directions at once. As *Van Gorkom* and *Zirn I* showed, the duty of disclosure had extended itself beyond its role in cases of shareholder ratification of transactions marked by self-interest; it now imposed an affirmative duty on a board to disclose all material information to shareholders whenever seeking their action. At the same time, *Van Gorkom* opened the way for expanding the remedy for breach from nullifying shareholder ratification (and, therefore, subjecting the underlying transaction to entire fairness review) to imposing damages based directly upon nondisclosure. This expansion of the remedy available for a board's breach of

---

80. *See Van Gorkom*, 488 A.2d at 881 (holding that "Trans Union's board was grossly negligent in that it failed to act with informed reasonable deliberation in agreeing to the Pritzker merger proposal . . . .").

81. *See* Hamermesh, *supra* note 56, at 1125 (noting "in a facet of the opinion much less heralded than its duty of care ruling, *Van Gorkom* took one further, significant step to enunciate an independent duty on the part of directors to disclose material information when submitting a merger proposal to stockholders and to authorize a post hoc damages remedy against directors who fail to fulfill that duty").

82. *See Van Gorkom*, 488 A.2d at 893 (holding that "the directors of Trans Union breached their fiduciary duty to their stockholders (1) by their failure to inform themselves . . . and (2) by their failure to disclose all material information" and that "an award of damages may be entered").

83. Del.Supr., 621 A.2d 773 (1993) [hereinafter *Zirn I*].

84. That day the Dow Jones Industrial Average fell 508 points and stock prices tumbled worldwide.

85. *See Zirn I*, 621 A.2d at 777.

86. *See id.* at 777–78.

87. *See id.* at 779.

the duty of disclosure reached new ground in *In re Tri–Star Pictures, Inc.*[88]

In *Tri–Star*, the Supreme Court held that a majority shareholder, with the help of the target's board, potentially manipulated a business combination whereby Tri–Star Pictures, Inc.'s majority shareholder, Coca–Cola Co., traded some of its entertainment subsidiaries to Tri–Star in return for newly-issued shares in Tri–Star.[89] The combination left Coca–Cola the 80% majority shareholder in the new, larger Tri–Star.[90] Tri–Star's pre-deal shareholders filed suit alleging that Coca–Cola overstated the value of its subsidiaries and manipulated the Tri–Star board's approval of the deal, diminishing the minority's proportional interest[91] in the surviving company.[92] The Plaintiffs also alleged that Tri–Star failed to disclose to the minority shareholders the negative impact that the transaction would have on their shares. The Court held that Tri–Star's failure to disclose the diminution in value of the minority's shares brought about by the merger appeared to invoke "a virtual *per se* rule of damages for breach of the fiduciary duty of disclosure."[93] This proclamation (although made in the context of traditional shareholder ratification of an interested transaction), in conjunction with the creation of a non-loyalty-based disclosure duty in *Van Gorkom* and *Zirn I*,

created what appeared to be an entirely new fiduciary duty. While a board could claim reasonable reliance on counsel and experts to affirmatively defend against a duty of care claim, the post-*Tri–Star* duty of disclosure seemed to demand liability for nondisclosure of material information whenever shareholder action was solicited regardless of the board's independence, disinterestedness, or good faith efforts to reasonably and fairly inform the shareholders.[94]

Recently, however, the Delaware Supreme Court clarified the nature of the duty of disclosure. In *Loudon v. Archer–Daniels–Midland Co.*,[95] the Supreme Court formulated a damages requirement for shareholder plaintiffs who pled breach of the duty of disclosure[96] and reaffirmed the superfluousness of disclosure of material information that would constitute "self-flagellation".[97] The *Loudon* Court erased the post-*Tri–Star* doubt as to whether non-loyalty-based disclosure claims required damages.[98] Although *Loudon* does not differentiate between disclosure claims where the board stands on both sides of the transaction and those where the board is disinterested and independent, it does distinguish between disclosure violations that negatively impact shareholder voting or economic rights and those that do not.[99]

**88.** Del.Supr., 634 A.2d 319 (1993).

**89.** *See id.* at 322.

**90.** *See id.*

**91.** Plaintiffs claimed that this diminution caused the minority a property or financial loss because their shares accounted for a smaller piece of the Tri–Star pie and a commensurate loss in voting power. *See id.* at 327.

**92.** The Supreme Court reversed the trial judge's ruling in favor of the Defendant's motion to dismiss. *See id.* at 335.

**93.** *Id.* at 333.

**94.** *See Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 779 (1993) (holding "a material omission is not rendered immaterial simply because the party making the omission honestly believes it insignificant").

**95.** Del.Supr., 700 A.2d 135 (1997).

**96.** *See Loudon*, 700 A.2d at 137–38.

**97.** *See id.* at 143.

**98.** *See id.* at 138 (holding that there may "be a potential damage remedy where the misstatement or omission implicates the stockholders' economic or voting rights.").

**99.** *See id.* at 142 (stating "*Tri–Star* stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages.").

The former requires damages, and the latter may be dismissed for failure to state a claim.[100] The implication is that even if the deal is unfair and despite possible nullification of the shareholders' ratification, no damages result solely from breach of the duty of disclosure unless shareholders' economic or voting rights are implicated.[101] One would expect the same result if, under traditional disclosure analysis, the shareholder ratification was nullified and the underlying transaction was directly examined and passed entire fairness review. Instead, *Loudon* treats the duty of disclosure claim as a stand-alone action, but it adds a damages element that adequately treats both loyalty-based and non-loyalty-based disclosure claims. Under *Loudon*, a shareholder can recover quantifiable damages, but may not expect an automatic award for every disclosure violation.[102]

### C. Parties' Contentions And Rulings of Law [103]

#### 1. EPS Manipulation And Stock Repurchase Claim

Defendants ask this Court to dismiss all elements of the EPS Manipulation and Stock Repurchase claim. They characterize Plaintiffs' claim that EPS is inherently subject to manipulation as unfounded and conclusory. Plaintiffs respond that their complaint demonstrates that changes in earnings caused by the accounting practices and stock repurchases will have a more volatile impact on EPS compared to using return of equity (ROE) as a benchmark and, thus, the impact of that volatility on bonuses is a material fact.[104] They

---

**100.** *See id.* at 138 (holding that a failure to plead facts implicating shareholders' economic or voting rights made complaint susceptible to dismissal).

**101.** *See id.*

**102.** *See id.* What is uncertain, however, is whether rescissory damages would or would not be available. That issue need not be resolved to rule on the disclosure claims in this case.

**103.** Because I rule for the Defendants on other grounds, this Opinion does not reach the Defendants' arguments regarding laches.

**104.** While my decision on Plaintiffs' disclosure claim is not decided based on their argument that the Board improperly manipulated the formula by which management received stock options, I add this footnote to illustrate that Plaintiffs' accounting appears to be erroneous. Plaintiffs claim that the change from a ROE-based method to one based on EPS results in a much more manipulable basis for the awarding of stock options. Based on the following example, I fail to see how this can be the case.

Like nearly all stock, Disney stock trades above its book value. In other words, the market price of one share of Disney stock (approximately $35 at June 30, 1998) multiplied by the number of shares outstanding (approximately 2.1 billion at June 30, 1998) (the product of which is $73.5 billion) is greater than the company's shareholders' equity ($19.2 billion at June 30, 1998). This is so because the value of a company as a going concern, especially a successful company like Disney, is typically greater than the difference between the book value of its assets and its liabilities.

Where this is the case and a company buys back shares of its stock, the balance sheet will reflect a decrease in assets (or an increase in liabilities if debt is used) in the amount of the market value of the stock purchased and an equal decrease in shareholders' equity (to account for treasury stock added). For example, if Disney buys back 20% of its common shares on June 30, 1998, at its market price, it would spend $14.7 billion (20% of the $73.5 billion market capitalization). Assuming it pays cash, assets would drop by $14.7 billion, and shareholder's equity would drop by $14.7 billion, from $19.2 billion to $4.5 billion.

I make several assumptions for simplicity's sake. First, the earnings (for EPS) and return (for ROE) are the same figure, $2 billion, and this figure is the same in both 1997 and 1998. Also, equity (for ROE) and shares (for EPS) are based on the average amount for the previous twelve months. Finally, the stock buyback on June 30, 1998, is the only one in 1997 or 1998. Therefore, average shareholders' equity in 1997 is $19.2 billion, and average shareholders' equity in 1998 is $11.85 billion ($19.2 billion for half the year and $4.5 billion for half). Also, average shares outstanding in 1997 are 2.1 billion, and average shares outstanding in 1998 are 1.89 billion (2.1 billion for half the year and 1.68 billion for half).

Based on those figures, ROE increases as a result of the buyback from 10.42% ($2 billion

add that the EPS methodology was material to the stock repurchase program because it shielded the executives' bonuses from the reduction in Disney's net worth caused by the repurchases. Plaintiffs further allege that shareholders were not aware when they approved the Bonus Plans that the use of EPS to calculate bonuses would enable Disney's directors to manipulate the income statements through write downs and repurchases, thereby granting themselves expensive bonuses without diluting the number of outstanding shares, and doing so at the expense of the outside shareholders' economic interests in Disney. This, they allege, constitutes a failure to disclose material information.

 "To state a claim for breach by omission of any duty to disclose, plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted *from the proxy materials* [or shareholder solicitation] and describe (5) how the omission caused injury." [105] Once submitted for shareholder ratification, certainly the current Director Defendants owed a duty to disclose all information germane to the reelection and Bonus Plans. Shareholder approval of these proposals would be nullified if all reasonably available material information was not provided, and damages would be available if that nondisclosure injured either Plaintiffs' economic interests or voting rights in Disney. It is Plaintiffs' burden, however, to plead facts showing each element of their omission claim. They fail to do so for two elements.

 First, Plaintiffs fail to convincingly explain why the change from one accounting convention as a basemark to another is "inherently manipulable" or how that change was improperly related to the directors' reelection or the Bonus Plans. In other words, Plaintiffs fail to prove materiality. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." [106] As for the allegation that the manipulable nature of EPS must be described, I must side with Defendants. Without a duty of loyalty claim or some other reason to suspect misdeeds, there exists no obligation to compare and contrast the use of EPS with the use of ROE when switching, only an obligation to tell voting shareholders that bonuses will be calculated using EPS if the shareholders approve the Bonus Plans.

Hence, the switch to EPS from ROE and the varied and innumerable potential accounting deceptions that *might* ensue are not material as a matter of required disclosure. Apparently, Plaintiffs hoped to rework the significant impact on earnings of the fully-disclosed accounting practices as a material aspect of EPS, its so-called "manipulable nature," and allege that this manipulable nature was not disclosed. By informing the shareholders that EPS was the new accounting benchmark, the impact on earnings of the accounting practices was fully disclosed to shareholders. I am unwilling, as Plaintiffs seem to request, to require disclosure of *potential* abuses or indiscretions that may or may not materialize. Plaintiffs fail to allege specific facts that could show that the "manipulable na-

---

divided by $19.2 billion) in 1997 to 16.88% ($2 billion divided by $11.85 billion) in 1998, an improvement of 62 .0%. EPS climbs from $.952 ($2 billion divided by 2.1 billion shares) in 1997 to $1.058 ($2 billion divided by 1.89 million shares) in 1998, an increase of 11.1%. Therefore, the buyback actually results in a significantly greater improvement in the return on equity (62.0%) than in the earnings per share (11.1%). This indicates to me that management can more easily manipulate ROE than EPS, and so plaintiffs' argument to the contrary appears to fail. Again, however,

I do not base my decision on this result; I do this only as further proof that plaintiffs' claims in this matter are lacking.

105. *Wolf v. Assaf,* Del. Ch., C.A. No. 15339, mem. op. at 4, Steele, V.C., 1998 WL 326662 (June 16, 1998) (citing *Loudon,* 700 A.2d at 137–38) (emphasis in original).

106. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 778 (1993) (citing *TSC Indus. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

ture" of EPS had actually manifested itself in any of the Board's actions and thus was subject to disclosure.[107] Delaware law has never required the disclosure of such worst case hypotheticals,[108] and therefore their claims must fail as a matter of law.

The inclusion of allegations regarding stock repurchases made in conjunction with the exercising of executive stock options does not rescue this claim from my determination of immateriality. Plaintiffs' attempt to couple the repurchases with the stock option grants claiming that, taken together, there is a potential for veiled abuse and that that potential should have been disclosed. It may be that under certain circumstances, this Court will entertain a properly pled direct action claiming that a board breached its fiduciary duties by granting large numbers of stock options that are exercised by insiders and then repurchasing large numbers of shares on the open market, if the shareholder pleads (in non-conclusory fashion) that the *intentional cumulative effect* is to dilute the economic or voting interests of the outside shareholders.[109] But, no such loyalty claim was made here.

Plaintiffs here attempt to state a claim for failure to disclose the allegedly wrongful conduct, *i.e.*, the potentially harmful impact of Disney's cycle of executive option exercises and stock repurchases. Because the Bonus Plans were subjected to shareholder ratification, the failure to advise shareholders of this potential abuse of the option exercises and stock repurchases was, according to Plaintiffs, a breach of the duty to disclose. Defendants respond that the economic impact of stock repurchases—a use of cash to buy securities—by definition creates a cash outflow and that the difference between the stock option exercise price and the market price is part of the employees' compensation for services rendered. Defendants add that the financial impact on Disney of the stock options was adequately disclosed by informing shareholders that Disney will, and has, granted its executives stock options with a strike price below market value. Finally, Defendants conclude that requiring them to characterize the option grants and stock repurchases as harmful to Disney runs afoul of the rule against self-flagellation.

Again, I must side with Defendants. I am unable to accept Plaintiffs' attempt to describe as wrongful the negative cash flow effect on Disney's financials due to the option exercises and stock repurchases and their attempt to assert that the stock repurchases are wrongful because they counteract the dilution of stock caused by executives exercising their stock options. The problem with that logic is that, to some extent, every exercise of a stock option dilutes the outstanding equity, but

107. *See generally Loudon v. Archer–Daniels–Midland Co.*, Del. Ch., C.A. No. 14638, mem. op., 21 Del. J. Corp. L. 724, 732, Jacobs, V.C., 1996 WL 74730 (Feb. 20, 1996) (holding that directors have no duty to "engage in 'self-flagellation' by confess[ing] mismanagement or wrongdoing, or by admitting to a breach of fiduciary duty 'before it [is] properly determined in a court of law' ") (citations omitted).

108. Similarly, any allegation that shareholders would need to know that the five directors approved such a potentially manipulable bonus calculation methodology, when the shareholders evaluated *the five directors* up for reelection, would constitute exactly the kind of managerial minutiae protected from disclosure under the rule against self-flagellation.

*See generally Wolf*, C.A. No. 15339, at 13, 1998 WL 326662.

109. At the same time, if the cumulative effect is to diminish corporate assets, the claim should be brought derivatively. *See Avacus Partners v. W. Brian, M.D.*, Del. Ch., C.A. No. 11001, Allen, C., 1990 WL 161909 (Oct. 24, 1990) ("Shareholders do have a right to vote their shares, however, so a claim that the board improperly acted to entrench itself by issuing stock that impacts the shareholders' voting power may state either an individual or a derivative claim. ... If the stock is issued for inadequate consideration, the corporation itself will be directly injured as well and both individual and derivative wrongs might be alleged.").

here that conduct was approved by the shareholders when they approved the Bonus Plans. There is nothing inherently sinister about taking into account the exercise of shareholder-approved executive stock options when management engages in stock repurchases designed to maintain Disney's market price and/or amount of outstanding equity in the company.[110] Thus, I cannot conclude the repurchases would be material to a reasonable shareholder consideration of the Bonus Plans.

Theoretically, Plaintiffs may have had some basis to seek nullification of Disney's shareholders' ratification of the Bonus Plans by claiming that the shareholders were not adequately informed. But, that claim cannot hold where the allegedly omitted material information was simply the *potential* for a "link" between the options and repurchases. In order to succeed on that theory, Plaintiffs would have had to specifically allege that the Board had *designs* to mislead shareholders by hiding the intention to surreptitiously increase compensation. This is not that case. Here Plaintiffs have alleged no facts which would lead me to believe that the Board did anything other than disclose all of the information that a reasonable shareholder would have deemed significant in connection with approving the Bonus Plans.

 Plaintiffs fail to state a claim for a second reason: They allege no facts showing the claim's last element—a quantifiable and legally cognizable harm to Disney's shareholders arising from the alleged nondisclosure. Assuming *arguendo* that the Bonus Plans were grossly unfair compensation and that the shareholder ratification was null because of the nondisclosure of a material fact, under *Loudon*, the Plaintiffs cannot prove damages based on their allegations of waste that would accrue to the shareholders as a class. *Loudon's* mandate that a plaintiff plead quantifiable damages does not undo the well-established doctrinal division between direct shareholder claims and derivative suits. To claim damages as a shareholder, the shareholder must show that the injury was peculiar to a particular class of shareholders or peculiar to shareholder interests as opposed to the company's, *i.e.*, that shareholders have a direct claim.[111] Here,

---

110. Again, I need not address the accounting issues in Plaintiffs' complaint to reach my ultimate conclusion, but I question the reasonableness of several of Plaintiffs' arguments. For example, Plaintiffs argue that by accelerating losses in fiscal year 1996 via asset writedowns and purchase accounting, management has created a situation whereby future earnings will be higher. Am. Compl. ¶¶ 172–187. But Plaintiffs fail to explain why management would have been willing to take such losses in 1996, when such losses would likely negatively impact their receipt of options for that year.

Furthermore, Plaintiffs fail to point out that accounting benefits from purchase accounting are only available after an acquisition—here, for the Capital Cities/ABC acquisition—and after that they disappear. The *Wall Street Journal* article cited by plaintiff in ¶¶ 183–84 states, "some analysts are warning that these special accounting benefits . . . are starting to wane"—this from mid–1997. Linda Sandler, *Even Disney's Magic Kingdom Has Problems, Analysts Say, Despite Steady Climb in Stock*, Wall St. J., May 5, 1997, at C2. The *Forbes* article, on which Plaintiffs rely for many of their allegations in this section of their complaint, illustrates this point and quotes a rival executive as saying that at the end of this period, "Either we come through with real earnings gains or we fall off the cliff." Lisa Gubernick, *Mickey Mouse, CPA*, Forbes, Mar. 10, 1997, at 42. This article implies that Disney's worst sin is "promising predictable earnings in an unpredictable business," *id.*, hardly a sinister plot.

Finally, in paragraph 185, Plaintiffs discuss the "fiction" that was Disney's accounting for its Capital Cities/ABC acquisition. However, Plaintiffs fail to allege with any particularity how this acquisition itself resulted in manipulated earnings leading to more, or more valuable, stock options for the executives involved. Plaintiffs argue vaguely that Disney's "as reported" earnings for 1996 actually showed flat earnings from 1995 to 1996, but they fail to show how stock options were affected by such alleged manipulations. In short, Plaintiffs' accounting arguments are unclear and appear, in many instances, to be wrong.

111. *See Kramer v. Western Pacific Indus.*, Del. Supr., 546 A.2d 348, 351 (1988) ("Thus, *to*

any judgment that the Bonus Plans wasted company assets should result in an award of damages to Disney, not directly to its shareholders. Plaintiffs have not pled a derivative claim. Thus, if this claim did go to trial, it could not result in a class award.

## 2. The Ovitz Termination Clarification Claim

Defendants attack this claim on the grounds that no statement was misleading and that the claim pleads no legally cognizable monetary damages. They argue that Plaintiffs cannot recast their above-dismissed derivative claim—that Ovitz's termination without cause was wrongful—as a claim that nondisclosure of the wrongfulness of the termination with benefits was wrongful. Plaintiffs state that Eisner's partial, misleading statements about Ovitz's termination required clarification and that, without it, shareholders were misled at the annual meeting. They believe that the Board's non-action on the Ovitz termination reflects managerial incompetence, i.e., a failure of due care, on the current Director Defendants' part which was material to shareholder evaluation of the five directors' reelection. Defendants reply that Eisner's comments failed to trigger a duty to clarify because they were not misleading and it was never material to the five directors' reelection or the Bonus Plans.

A board can breach its duty of disclosure under Delaware law in a number of ways—by making a false statement, by omitting a material fact, or by making partial disclosure that is materially misleading.[112] The last of these occurs where a board makes a required or even non-obligatory pronouncement on a subject that is incomplete and by which shareholders are materially misled. When the issue of partial disclosure arises, the relevant inquiry is whether shareholders are misled as to the corporation's significant prospects (i.e., material facts), and it is *not* a question of whether or not there was an ambiguity or misstatement that might lead shareholders to an incorrect conclusion about an insignificant or irrelevant fact which has no bearing on any other material facts.[113] Notable characteristics of a duty of disclosure claim based on a partial disclosure are (a) the possibility that the disclosure was voluntary, (b) the fact that the statement may become material if it is brought before the shareholders, and (c) the fact that the partial disclosure is misleadingly incomplete as it relates to other material facts. A board that provides a partial disclosure must rectify the misleading statement with follow-up disclosure that makes the information true and complete[114] or face the consequences of a breach of fiduciary duty.

have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation."), *see also Moran v. Household International, Inc.,* Del. Ch., 490 A.2d 1059, 1070, *aff'd,* Del.Supr., 500 A.2d 1346 (1985) ("[t]o set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation") (quoting *Fletcher's Cyclopedia Corporations* § 5921, at 451 (perm. ed. rev.vol.1984) (citations omitted)). For a plaintiff to have standing to bring an individual action, he must be injured directly or independently of the corporation. *See Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 249 (1970).

**112.** *See Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1056 (1996) (hereinafter *"Zirn II"*) ("We hold that it is materially misleading to advise shareholders in a tender offer transaction of part, but only part, of the advice of the company's patent counsel as to the patent status of the company's most valuable asset.").

**113.** *See Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.").

**114.** *See Zirn II,* 681 A.2d at 1056 ("Under *Arnold [v. Society for Savings Bancorp,* 650 A.2d 1270 (Del.Supr.1994)]*,* the disclosure of even a non-material fact can, in some instances, trigger an obligation to disclose additional,

■ Generally, to state a claim of partial, misleading disclosure, a plaintiff must plead facts identifying a(1) perhaps voluntary, but (2) materially incomplete (3) statement (4) made in conjunction with solicitation of shareholder action that (5) requires supplementation or clarification through (6) corrective disclosure of perhaps otherwise immaterial, but reasonably available information;[115] and the plaintiff shall describe in the complaint (7) how the omission caused injury.[116]

The Plaintiffs in this action attempt to convert their flawed derivative claim against Disney for paying Ovitz severance benefits to a disclosure claim. First, they claim that the information was germane to shareholder consideration of the five directors' re-election because shareholders would consider important within the total mix the fact that these directors approved such extravagant waste. That assertion runs afoul of the rule against self-flagellation:

> Delaware law does not, however, require a proxy statement to impugn a director's character or draw negative inferences from his past business practices. It only requires a summary of his credentials and his qualifications to serve on the board as well as a description of any conflicts of interest. Nothing in our law requires a masochistic litany of management minutiae.[117]

■ Plaintiffs seek to evade this rule by claiming that Eisner's statements at the annual meeting constituted a partial disclosure or false characterization of the Ovitz termination which brought the matter before the shareholders and invoked a duty to clarify the circumstances surrounding Ovitz's departure. Thus, they state their disclosure claim as a duty to clarify Eisner's comments.

That claim must fail, however, for failure to plead essential elements. First, as a matter of law they fail to show that Eisner's statements were misleading (i.e., incomplete or, for that matter, false). I have already dismissed Plaintiffs' derivative claim that the severance payments were waste or otherwise a breach of fiduciary duty because I concluded that it was within the Board's discretion to terminate Ovitz without cause. That decision is protected by the business judgment rule, and Eisner's statement to the effect that Ovitz must receive his severance payments reflects only Disney's contractual obligations after the Board exercised its authority to terminate Ovitz. In light of my ruling that the Board's action in the Ovitz termination was entirely appropriate, Eisner's statements do not overcome the business judgment rule presumption and force Disney to reveal the Board's decisionmaking process. At the annual meeting, Eisner described hiring Ovitz as an error and stated that Disney owed Ovitz termination benefits.

---

otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders.").

**115.** If nothing else, the sixth element adds the condition of reasonable availability to the information that might cure partial disclosure. I include that element because the same reasonable availability condition is placed upon information alleged to have been omitted in omission claims. *See Wolf v. Assaf,* Del. Ch., C.A. No. 15339, mem. op. at 4, Steele, V.C., 1998 WL 326662 (June 16, 1998).

**116.** *See generally Zirn II,* 681 A.2d at 1055–58; *cf. Wolf,* C.A. No. 15339, at 4, 1998 WL 326662. Partial disclosure encompasses those instances in which a company makes

voluntary, but misleading statements when seeking shareholder action. All disclosure must be true and accurate. *See Zirn II,* 681 A.2d at 1057 ("The only distinction between this [partial disclosure] case and the traditional disclosure context is that, in the partial disclosure setting, the initial disclosure may sometimes be voluntary rather than mandatory.") Partial disclosure might be seen as filling a gap between false statements and omissions, capturing those statements in which the disclosed information was not false and the omitted information was not material, but overall the impact of the statement was materially misleading.

**117.** *Wolf,* C.A. No. 15339, at 14–15, 1998 WL 326662.

Even assuming all of the facts pled by Plaintiffs are true, there is no reason to think that Eisner's statements were incomplete or inaccurate. Thus, as a matter of law they trigger no duty to clarify.

A second reason why the disclosure claim must fail is revealed by an examination of *Zirn II*,[118] the second decision in the *Zirn* litigation by the Delaware Supreme Court.[119] The *Zirn II* Court held that the board of directors of VLI breached its duty of disclosure by partially disclosing the legal opinion of its patent lawyers in a merger solicitation. Specifically, the board breached its duty by selecting only parts of the legal opinion favoring the board's advice to shareholders to approve the merger, but the Court concluded that monetary damages were precluded by the company's adoption of a 102(b)(7) exemption.[120] VLI was under no duty to disclose its patent attorney's opinion, but chose to do so. VLI's shareholder solicitation read, "The Company is unable to estimate when this petition for reconsideration will be decided by the Patent and Trademark Office and has been advised by special patent counsel that there is a significant possibility of the reconsideration petition not prevailing in the Patent and Trademark Office."[121] This disclosure relied on VLI's lawyers' purportedly negative evaluation of the prospects of VLI winning its petition to reinstate its patent for contraceptive sponges, but discovery revealed that the lawyers had elsewhere written VLI that the company had an excellent chance of ultimately prevailing on the merits of its petition.[122] VLI's self-serving cut-and-paste disclosure is the kind of materially misleading partial disclosure that triggers a duty to clarify.

The basis for the Plaintiffs' claim in this action, however, is different. Eisner never discussed the Board's decisionmaking process or gave reasons why Ovitz was terminated without cause, tiptoeing over reasons to the contrary. Even assuming that all of Plaintiffs' alleged facts are true, I am unable to conclude, as a matter of law, that Eisner set off down the "slippery slope" of characterizing his Board's thinking or discussion on the Ovitz termination.[123] Thus, whatever brief mention of the Ovitz termination that there may have been was immaterial to the directors' re-election and ratification of the Bonus Plans. The mere mention of the Ovitz termination did not bind Eisner to explain the details of the Board's decisionmaking process or the factual or legal basis behind that determination. To so hold would mean that if a subject was mentioned publicly, a board would have to disclose every detail that was discussed on that subject at its board meetings or risk liability for breach of the duty to disclose. Such an overly broad rule would ill serve shareholders because, on the margin, it would serve to discourage disclosures, as boards would fear that the mere mention of a confidential subject would require subsequent full disclosure.

 Thirdly, Plaintiffs fail to allege any quantifiable monetary damage to shareholders arising from the alleged failure to clarify Eisner's comments. As stated before, any harm that could arise from adoption of the Bonus Plans would be inflicted upon the company, but the Plaintiffs have not pled this claim derivatively.

118. Del.Supr., 681 A.2d 1050 (1996).

119. *See supra* text accompanying notes 83–87.

120. *See Zirn II*, 681 A.2d at 1053.

121. *Id.* at 1054 (citing VLI's Form 14D–9).

122. *See id.* at 1056–57 ("In a November 3, 1987 letter from patent counsel to the VLI Board of Directors, patent counsel expressed the view that, '[r]egarding the likely outcome of [patent counsel's] ... efforts [to reinstate the patent], it is my opinion, and the opinion of other members of my law firm, that we have an excellent case on the merits and there is a good chance that we will prevail in the PTO.'" (alterations in original)).

123. *Wolf v. Assaf*, Del. Ch., C.A. No. 15339, mem. op. at 13, Steele, V.C., 1998 WL 326662 (June 16, 1998).

Thus, to the extent that Plaintiffs base their disclosure claim on the materiality of the Ovitz termination vis-a-vis the Bonus Plans, they fail to state a valid direct claim because under no scenario would the shareholders be the direct recipients of a damage award. As for the directors' re-election, Plaintiffs ask me to nullify the election or, in the alternative, for rescissory or compensatory damages. Although a disclosure violation might, in certain circumstances, serve as the basis to nullify an election or impose other relief, I can conceive of no basis for awarding rescissory or compensatory damages resulting from the election of directors for the type of immaterial nondisclosure alleged here.[124] Therefore, as a matter of law, damages are unavailable for this claim.

### D. Conclusions

For the reasons set forth above, I dismiss Plaintiffs' EPS Manipulation and Stock Repurchase claim for failure to plead the elements of materiality and damages. Because the Ovitz Termination claim fails to sufficiently allege how and why Eisner's comments were material, false or incomplete, no duty to clarify arises. Thus, this claim too must be dismissed.

### VII. THE CONTRACT CLAIM AGAINST OVITZ

■ Having dismissed Plaintiffs' claims against the Director Defendants, I now turn to the claims asserted against Ovitz individually. In the third count of the amended complaint, Plaintiffs assert *on behalf of Disney* that Ovitz breached the Employment Agreement, and seek to recover for the alleged breach. Because the right to bring this claim for breach of contract belongs to Disney, Plaintiffs must satisfy the pre-suit demand requirements of Court of Chancery Rule 23.1.

*Rales v. Blasband* establishes the standard for pre-suit demand where, as here, the conduct challenged, *i.e.,* breach of contract, is something other than a decision of the board of directors.[125] Under *Rales,* the Court, applying only the first prong of *Aronson,* considers whether Plaintiffs' particularized factual allegations create a reasonable doubt that the board could have exercised its disinterested and independent judgment in responding to a demand to assert a contract claim against Ovitz.

■ Earlier, I concluded that Plaintiffs failed to allege particularized facts to create a reasonable doubt that the Disney Board was capable of disinterested and independent judgment regarding the Board's approval of Ovitz's Employment Agreement and subsequent Non–Fault Termination. My decision here is no different: The Disney Board was fully capable of exercising its business judgment to decide whether to sue Ovitz for breach of contract. Because Plaintiffs have failed to satisfy the first prong of *Aronson,* demand on the Board would not have been futile. Since Plaintiffs were required to make a demand on the Board before bringing this claim on behalf of Disney for breach of contract, Plaintiffs' third count against Ovitz must be dismissed.

### VIII. ADDITIONAL CLAIMS AGAINST OVITZ

■ Plaintiffs also assert a claim against Ovitz for false representations in connection with Disney's 1997 proxy statement. Ovitz, however, was not on the Board at the time the proxy statement was disseminated. Therefore, the disclosure claims are dismissed as to Ovitz for this additional reason.

---

124. *See Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 141 (1997) ("There may be circumstances under which a proxy statement soliciting votes for the election of directors is actionable under Delaware law for material misstatements or omissions. Injunctive relief in the form of corrective dis-closures and resolicitation may be appropriate if the matter is addressed in time by a court of equity. It is difficult to see how damages may also be available in such a case." (citation omitted)).

125. Del.Supr., 634 A.2d 927 (1993).

Plaintiffs also assert a claim against Ovitz in the first count of the amended complaint, alleging that as a Disney director, Ovitz breached his fiduciary duties by exploiting the terms of the Employment Agreement that allowed him to receive the severance benefits at the heart of this dispute. Because I have already dismissed Plaintiffs' breach of fiduciary duty claims (included in count one of the amended complaint) for lack of demand, I need not consider Plaintiffs' breach of fiduciary duty claims as to Ovitz individually.

## IX. CONCLUSION

For the reasons assigned above, all counts of Plaintiffs' amended complaint must be dismissed for failure to make demand on the Disney Board in accordance with Chancery Rule 23.1 or for failure to state a claim under Chancery Rule 12(b)(6).

An Order has been entered in accordance with this Opinion.

## *O R D E R*

For the reasons set forth in this Court's Opinion entered in this case on this date, it is

ORDERED:

1. Plaintiffs' claims of breach of fiduciary and waste, as set forth in Counts I and II of the amended complaint, are dismissed for failure to make demand as required under Court of Chancery Rule 23.1;

2. Plaintiffs' claims, as set forth in Counts I and III of the amended complaint, against Michael Ovitz for breach of fiduciary duty and for breach of the Employment Agreement are dismissed either for failure to state a claim under Court of Chancery Rule 12(b)(6) or for failure to make demand as required under Court of Chancery Rule 23.1; and

3. Plaintiffs' claims of breach of the fiduciary duty of disclosure, as set forth in Count IV of the amended complaint, are dismissed for failure to state a claim under Court of Chancery Rule 12(b)(6).