# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAMBRIDGE RETIREMENT SYSTEM, derivatively on behalf of Unilife Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9178-CB |
| SLAVKO JAMES JOSEPH BOSNJAK, JEFF CARTER, JOHN LUND, WILLIAM GALLE, MARY KATHERINE WOLD, MARC FIRESTONE, and ALAN SHORTALL, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| UNILIFE CORPORATION, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 9, 2014
Date Decided: June 26, 2014

Christine S. Azar and Ned Weinberger of Labaton Sucharow LLP, Wilmington, Delaware; Christopher J. Keller, Eric J. Belfi and Michael W. Stocker of Labaton Sucharow, New York, New York, Attorneys for Plaintiff.

M. Duncan Grant and James G. McMillan, III of Pepper Hamilton LLP, Wilmington, Delaware; Jay A. Dubow of Pepper Hamilton, Philadelphia, Pennsylvania, Attorneys for Defendants.

**BOUCHARD, C.**

## I. INTRODUCTION

This action involves derivative claims for breach of fiduciary duty (Count I) and corporate waste (Count II) concerning compensation paid to the non-executive directors of Unilife Corporation ("Unilife" or the "Company") since November 2010. The challenged compensation consists of two components: (1) equity awards the Unilife directors granted to themselves subject to obtaining stockholder approval for those awards and (2) cash compensation the directors paid to themselves without obtaining stockholder approval.

Unilife has moved to dismiss the complaint for failure to make a pre-suit demand upon the Unilife board of directors or to plead facts that excuse such a demand and, as to certain claims, for failure to state a claim upon which relief may be granted. For the reasons set forth below, I conclude that demand is excused under the first prong of *Aronson* because the claims involve self-dealing transactions implicating a majority of the members of Unilife's board of directors at the time suit was filed. I also conclude that the fiduciary duty claim should be dismissed for failure to state a claim for relief insofar as it relates to the outside directors' equity awards because each of those awards was specifically approved by Unilife's stockholders and that the corporate waste claim fails to satisfy the stringent standard for stating such a claim. Defendants did not seek to dismiss the fiduciary duty claim for failure to state a claim for relief insofar as that claim relates to cash compensation paid to the directors for their services as directors. Thus, that claim survives.

## II.    BACKGROUND[1]

### A.    The Parties

Unilife is a manufacturer and supplier of injectable drug delivery systems, including retractable syringes.  In 2002, the Company was founded in Sydney, Australia.  In 2008, Unilife moved its operations to York, Pennsylvania.  In 2010, Unilife redomiciled from Australia to the State of Delaware and became listed on the NASDAQ Global Market.

Since its formation in 2002, Unilife has failed to turn a profit or to generate significant revenues.  During its last three fiscal years,[2] Unilife's revenues declined from $6.7 million in fiscal year 2011, to $5.5 million in fiscal year 2012, to $2.7 million in fiscal year 2013.  During this same period, the Company incurred losses of $40.7 million in fiscal year 2011, $52.3 million in fiscal year 2012 and $63.2 million in fiscal year 2013.

---

[1] Unless otherwise noted, the facts recited in this Memorandum Opinion are based on the allegations in plaintiff's complaint, documents integral to or incorporated in the complaint, or facts of which the Court may take judicial notice.  Plaintiff acknowledges that the Company's 2010 to 2013 proxy statements are incorporated by reference into its complaint.  Pl.'s Answering Br. 7.

[2] Unilife's fiscal year runs from July 1 to June 30.  For example, its fiscal year 2011 ended on June 30, 2011.

Plaintiff Cambridge Retirement System is a Massachusetts-based retirement system. It has held Unilife common stock continuously since November 2010, and challenges the compensation paid to Unilife's outside directors during this period.[3]

From November 2010 until November 2012, Unilife's board of directors had seven members, consisting of its Chairman and Chief Executive Officer, Alan Shortall, and six outside directors: Slavko James Joseph Bosnjak, Jeff Carter, John Lund, William Galle, Mary Katherine Wold and Marc Firestone. Firestone left the board in November 2012. As of the date the complaint in this action was filed on December 20, 2013, the board consisted of six directors: Shortall, Bosnjak, Carter, Lund, Galle and Wold.

## B. Non-Management Director Compensation

During the period at issue, Unilife compensated its outside directors through a combination of equity awards and cash compensation. Significant to the pending motion, the Unilife board conditioned its grant of each of the challenged equity awards on obtaining stockholder approval, which the stockholders provided.

On January 8, 2010, in connection with Unilife's redomiciliation from Australia to the State of Delaware, the Company's stockholders approved the adoption of its 2009 Stock Incentive Plan (the "2009 Plan").[4] Thereafter, on two separate occasions, the

---

[3] In the face of a challenge to its standing to assert claims concerning compensation paid to the outside directors before November 2010, Cambridge explicitly disclaimed any intention to seek repayment of such compensation. Pl's Answering Br. 7, n.7.

[4] Defs.' Opening Br. Ex. F at 24, 38, 49 (Unilife Corp., Amended Registration Statement (Form 10) (Feb. 11, 2010)).

stockholders approved specific equity awards that the directors had granted themselves under the 2009 Plan conditioned on the receipt of stockholder approval.

At a stockholders' meeting held on December 1, 2010, Unilife's stockholders approved grants of options to directors Wold and Firestone to purchase 100,000 shares of common stock each under the 2009 Plan.[5] These grants were the subject of two proposals (Proposals No. 3-4) for stockholder approval described in a proxy statement dated October 18, 2010.

Proposal No. 3 explained that the 100,000 options for Wold would have an exercise price of $6.83 per share based on the closing price of the Company's shares on May 11, 2010 (the date the Unilife board approved the grant), would be exercisable for five years and would vest as follows:  16,667 options would vest within three business days of the Company obtaining stockholder approval, 25,000 shares would vest on the 12 month anniversary and 24 month anniversary of the date of grant and 33,333 shares would vest on the 36 month anniversary of the date of grant.  Proposal No. 4 provided the same information concerning the 100,000 options for Firestone except that they would have an exercise price of $6.19 per share based on the closing price of the Company's shares on July 27, 2010, the date the Unilife board approved the grant.[6]  The proxy statement also disclosed that the common stock underlying the options for Wold and

---

[5] Defs.' Opening Br. Ex. B at 39-40 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 14, 2011)).

[6] Defs.' Opening Br. Ex. A at 15-16 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 18, 2010)).

Firestone have a "market value" of $683,000 and $619,000, respectively, based on the closing price of the Company's common stock on the date Unilife's board approved each grant.

At a stockholders' meeting held on December 1, 2011, Unilife's stockholders approved grants of 45,000 stock-based awards each to directors Bosnjak, Carter, Galle, Lund, Wold and Firestone under the 2009 Plan.[7] These grants were the subject of six proposals (Proposals No. 5-10) for stockholder approval described in a proxy statement dated October 14, 2011. Proposals No. 5-10 explained that each non-executive director would receive 15,000 securities (either in the form of shares of common stock or phantom stock units) in each of 2011, 2012 and 2013 (assuming the director remained in service on the grant date).[8] The proxy statement also disclosed that the 45,000 securities to be granted to each of the non-executive directors have a "market value" of $189,000 based on the closing price of the Company's common stock on September 30, 2011, the date on which the board approved the grant.

In addition to receiving the foregoing equity awards, the outside directors each received cash compensation during the relevant period consisting of a mix of retainer and meeting fees. The fee structure for the outside directors was disclosed in Unilife's

---

[7] Defs.' Opening Br. Ex. C at 11(Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 16, 2012)).

[8] Defs.' Opening Br. Ex. B at 37-40 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 14, 2011)). This proxy statement also included a proposal (Proposal No. 12) to amend the 2009 Plan. *See id*. at 44-52.

October 18, 2010 proxy statement,[9] but stockholder approval of that fee structure was not sought. Some directors also received other forms of cash compensation. When all of the cash amounts are combined with the value of the equity awards, the outside directors received a total of $1,356,040 in fiscal year 2012, or approximately 25% of the Company's revenues that year, and a total of $668,240 in fiscal year 2013, or approximately 24% of the Company's revenues that year.[10]

According to the complaint, these amounts not only constitute an extraordinary percentage of the Company's revenues, but are excessive when compared to other companies in Unilife's sector. In particular, Cambridge alleges that, of eleven healthcare companies with market capitalizations between $41 million and $718 million, nine paid their directors, on average, less than $100,000 each in 2012 and eight paid their directors less than $70,000 each. By contrast, Unilife, which has had an average market capitalization of $287.9 million over the past five years, paid its outside directors average compensation of $226,007 in fiscal year 2012.[11]

---

[9] Defs.' Opening Br. Ex. A at 11-12 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 18, 2010)). In its proxy statement dated October 7, 2013, Unilife disclosed a new fee structure for compensating its outside directors that increased the annual retainers and eliminated the per meeting fees. Defs.' Opening Br. Ex. D at 11-12 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 7, 2013)).

[10] Compl. ¶ 23.

[11] Compl. ¶ 24.

### C. Procedural History

On December 20, 2013, Cambridge filed this derivative action on behalf of Unilife. The complaint asserts two claims against the director defendants, the first for breach of fiduciary duty and the second for waste of corporate assets. The defendants moved to dismiss both claims for failure to make demand under Court of Chancery Rule 23.1. They also moved to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) parts of the first claim and the second claim in its entirety.

## III. ANALYSIS

I first turn to the question whether the complaint alleges facts excusing demand before turning to whether the claims alleged in the complaint state a claim for relief.

### A. The Failure to Make a Demand

Where a decision of a corporation's board of directors is challenged, demand may be excused under either prong of the familiar two-prong *Aronson* test if particularized facts have been alleged to create a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[12] Plaintiff alleges that demand is excused here under the first prong of *Aronson* because five of the six members of the Unilife board at the time this action was filed are personally interested in their own compensation for their service as directors, which is the subject of the claims in this litigation. I agree and conclude that demand is excused for this reason.

---

[12] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

This conclusion is squarely supported by Chancellor Allen's decision in *Steiner v. Meyerson*.[13] There, confronted with a similar challenge to outside director compensation, Chancellor Allen found the first prong of *Aronson* to be satisfied in a straightforward, one sentence analysis: "As the outside directors comprise a majority of the Telxon board and are personally interested in their compensation levels, demand upon them to challenge or decrease their own compensation is excused."[14]

Defendants attempt to distinguish *Steiner* on the theory that the loyalty of the outside directors "was otherwise impugned" by virtue of their involvement in other transactions with Telxon's then chief executive officer, Robert Meyerson, which were the subject of other claims in the case.[15] This argument is inconsistent with the principle, cited in defendants' brief, that demand futility analysis is conducted on a claim-by-claim basis.[16] Indeed, there is no indication in Chancellor Allen's Rule 23.1 analysis in *Steiner*, quoted above, that he considered anything other than the outside directors' personal

---

[13] *Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995).

[14] *Id.* at *11.

[15] Defs.' Opening Br. 29. Defendants similarly try to distinguish *Seinfeld v. Slager*, 2012 WL 2501105 (Del. Ch. June 29, 2012), which included claims challenging compensation paid to certain executives and a claim challenging the payment of stock awards to the outside directors, who made up a majority of the board. Tellingly, the defendants in *Seinfeld* moved to dismiss the executive compensation claims under Rule 23.1 but did not try to do so with respect to the outside director compensation claim. *Id*. at *1.

[16] Defs.' Opening Br. 48. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) *aff'd*, 845 A.2d 1040 (Del. 2004) (citing *Yaw v. Talley*, 1994 WL 89019, at *9 (Del. Ch. Mar. 2, 1994); *Needham v. Cruver*, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993)).

financial interest in their own compensation when deciding that demand was excused as to the claim challenging that compensation.[17]

Defendants press two other arguments in an effort to avoid the straightforward application of the first prong of *Aronson* to this case. First, defendants argue that a director's interest in his own compensation should not be considered "disabling" under *Aronson* unless it is alleged that the compensation is material to the particular director in question.[18] Defendants have not identified any authority applying a materiality standard to a *self-dealing transaction* and I decline to do so.[19] Substantial precedent supports the opposite conclusion: where self-dealing is present, a plaintiff need not plead that a director's interest in a challenged transaction is material to him to establish that the director has a disabling interest.

---

[17] In 2000, Chancellor Allen's successor granted defendants' motion for summary judgment on the outside director compensation claim. *Merchants' Nat. Properties, Inc. v. Meyerson*, 2000 WL 1041229 (Del. Ch. July 24, 2000). On appeal, the Delaware Supreme Court reversed and remanded noting, among other things, that "the trial court did not consider the interplay between the Directors' compensation and the possible breach of fiduciary duties." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 266 (Del. 2002). This comment was directed to the analysis the trial court conducted when granting summary judgment in 2000, and did not concern Chancellor Allen's analysis at the motion to dismiss stage under Rule 23.1, which was not appealed.

[18] Defs.' Opening Br. 29.

[19] *See, e.g.,* Def.'s Opening Br. 29-32, citing *Grobow v. Perot*, 539 A.2d 180, 185 (Del. 1988) (receipt of director's fees alone, without more, did not render outside directors interested in a share repurchase from a major stockholder); *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 359 (Del. Ch. 1998) (outside director whose "salary as a teacher is low compared to her directors' fees" not beholden to Disney's chief executive officer regarding challenge to another executive's severance package); *Orman v Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) (outside director's interest in serving as a director of a surviving corporation did not render him interested in a merger transaction).

In articulating the two-prong test for determining whether demand is excused, the Supreme Court in *Aronson* defined "interest" to mean "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing."[20] In *Cinerama, Inc. v. Technicolor, Inc.*, the Supreme Court described self-dealing to exist when "a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation."[21] The Supreme Court further explained that "[t]raditionally, the term 'self-dealing' describes the 'situation when a [corporate fiduciary] is on both sides of a transaction . . . .'"[22] The transactions at issue here, the Unilife directors' payment of compensation to themselves, are classic forms of self-dealing.

In *Cede & Co. v. Technicolor, Inc.* ("*Cede II*"), the Supreme Court held that a personal financial benefit must be "material" to a director to qualify as a disabling interest, but in doing so, the Court distinguished self-dealing transactions.[23] Specifically, in *Cede II*, the Supreme Court affirmed Chancellor Allen's holding that "*[a]bsent evidence of self-dealing*, . . . evidence of any personal or special benefit accruing to a director . . . in an otherwise arms-length transaction does not establish a lack of independence sufficient to rebut the business judgment rule unless the director's self-

[20] *Aronson*, 473 A.2d at 812.

[21] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995) (subsequent history omitted) (citing 8 *Del. C.* § 144(a)).

[22] *Id.* (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[23] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362-63 (Del. 1993) (subsequent history omitted).

interest is also found to be 'material.'"[24] In so ruling, the Court noted the Chancellor's conclusion that a "plaintiff's burden of proof of a director's self-interest in an arms-length third-party transaction should be greater than in a classic self-dealing transaction where a director or directors stand on both sides of a transaction."[25]

The lack of a materiality standard for self-dealing transactions at common law is consistent with § 144 of the Delaware General Corporation Law, which applies to self-dealing transactions. Specifically, § 144 applies to any "contract or transaction [1] between a corporation and 1 or more of its directors or officers, or [2] between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest."[26] Significantly, § 144 does not contain any qualification for materiality. Instead, by its plain terms, it applies to self-dealing contracts and transactions irrespective of whether they are material to a director's personal financial circumstances.

Analyzing the Supreme Court's decisions in *Cinerama* and *Cede II* and their interplay with § 144, then-Vice Chancellor Strine determined that the materiality test articulated in those decisions does not apply when a director is deemed interested by

---

[24] *Id.* at 362 (emphasis added).

[25] *Id.*

[26] 8 *Del. C.* § 144(a).

virtue of § 144. Rather, a materiality standard only applies when § 144 is inapplicable.[27]

Chancellor Chandler similarly explained in *Orman v. Cullman*, that the need to demonstrate materiality to establish the interest of a director in a transaction applies only "in the absence of self-dealing" and that "whenever a director stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required."[28]

Finally, it bears mention that Chancellor Allen, who articulated the materiality test that was affirmed in *Cede II*, did not impose a materiality requirement in *Steiner*, which was decided after *Cede II*. In fact, the Chancellor found that demand was excused in *Steiner* despite his observation that the compensation for the directors "seem[ed] quite within a range that could be paid in good faith by a company seeking to attract competent, committed directors."[29]

Defendants base their second argument to avoid a straightforward application of the first prong of *Aronson* on 8 *Del. C.* § 141(h). That provision states that "[u]nless otherwise restricted by the certificate of incorporation or bylaws, the board of directors shall have the authority to fix the compensation of directors."

---

[27] *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 112-14 (Del. Ch. 1999); *Harbor Fin. P'rs. v. Huizenga*, 751 A.2d 879, 887 (Del. Ch. 1999) (materiality standard "is inapplicable when a director's interest implicates § 144.").

[28] *Orman v. Cullman*, 794 A.2d 5, 23, 25 n.50 (Del. Ch. 2002).

[29] *Steiner*, 1995 WL 441999, at *7.

According to defendants, the "only way to give effect to Section 141(h) is to require derivative plaintiffs not only to allege that a majority of directors are interested in their own compensation, but also to allege particularized facts" that would satisfy the second prong of *Aronson*, *i.e.*, to create a reasonable doubt that the directors' approval of their own compensation was the product of a valid exercise of business judgment.[30] Defendants provide no authority to support this novel interpretation of § 141(h).

Section 141(h) was enacted in 1969 in response to early Delaware cases that called into question the ability of directors to receive compensation for their services.[31] In 1922, the Delaware Supreme Court declared in *Lofland v. Cahall* that directors "have no right to compensation for services rendered within the scope of their duties as directors, unless it is authorized by the charter, by–laws, or the stockholders of the company."[32] In 1928, the Court of Chancery affirmed this principle in *Finch v. Warrior Cement Corp.*[33] In a contemporaneous analysis of the 1969 amendments to the Delaware General Corporation Law, it was explained that § 141(h) "was intended to lay to rest a suggestion by way of dictum . . . that directors are not empowered to vote compensation for members of the

---

[30] Defs.' Reply Br. 3.

[31] 57 Del. Laws ch. 148, § 6 (1969). *See also* 1 Edward P. Welch et al., *Folk on the Delaware General Corporate Law*, §141.16, at 4-342 (6th ed. 2014).

[32] *Lofland v. Cahall*, 118 A. 1, 3 (Del. 1922).

[33] *Finch v. Warrior Cement Corp.*, 141 A. 54, 63-64 (Del. Ch. 1928).

board unless authorized by a vote of stockholders or by a specific charter or by-law provision."[34]

On its face, § 141(h) only speaks to the authority of directors to set their own compensation. It does not address the standard of review applicable to such a decision. Given the plain text of § 141(h), its legislative history and the lack of any authority supporting defendants' novel interpretation of the statute, I reject defendants' invitation to rewrite the disjunctive two-prong test of *Aronson* to require that both prongs be satisfied when analyzing demand futility regarding a challenge to director compensation that plainly satisfies the first prong.

For the foregoing reasons, I conclude that plaintiff's failure to make a demand is excused.

## B.    Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim must be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[35]   "In determining whether a pleading meets this minimal standard, this Court draws all reasonable inferences in the plaintiff's favor,

---

[34] S. Samuel Arsht and Walter K. Stapleton, *Analysis of the 1969 Amendments to the Delaware Corporation Law*, 2 Corporation (P-H) at 350 (1969).

[35] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 537 (Del. 2011); *see also Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

accepts all well-pleaded factual allegations as true, and even accepts 'vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim.'"[36]

### 1. The Fiduciary Duty Claim

#### a. Cash Compensation

With one exception discussed below, defendants did not move to dismiss the fiduciary duty claim for failure to state a claim for relief under Rule 12(b)(6) insofar as that claim pertains to the cash compensation Unilife's directors paid themselves. This was a sensible decision. In reversing a subsequent grant of summary judgment in the *Steiner* case discussed above, the Delaware Supreme Court held that, "[l]ike any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation."[37] Thus, because demand is excused for the reasons stated above, this aspect of the fiduciary duty claim survives and it will be the defendants' burden to demonstrate the fairness of the cash compensation paid to the outside directors.

---

[36] *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012) (quoting *Cent. Mortg. Co.*, 27 A.3d at 535).

[37] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002) (citing *Hall v. John S. Isaacs & Sons Farms, Inc.*, 146 A.2d 602, 610-11 (Del. Ch. 1958), *aff'd in part*, 163 A.2d 288 (Del. 1960); *Meiselman v. Eberstadt*, 170 A.2d 720 (Del. Ch. 1961); *Wilderman v. Wilderman*, 315 A.2d 610 (Del. Ch. 1974)).

The one aspect of cash compensation for which defendants have sought dismissal concerns $346,392 and $216,479 that was paid to defendant Carter in fiscal years 2011 and 2012, respectively. These amounts are reported in the Company's proxy statements in a table entitled "Director Compensation" under the subheading "All Other Compensation" and are accompanied by a footnote stating that "Mr. Carter's other compensation *includes* amounts paid to a consulting entity of which Mr. Carter is the principal."[38]

At oral argument, plaintiff's counsel represented that plaintiff challenges only the compensation paid to the outside directors for their service as directors and does not challenge amounts paid to Carter for consulting services.[39] The use of the word "includes" in the footnote quoted above, however, leaves open the possibility that some of Carter's "other compensation" may have been paid for his services as a director and not as a consultant.

In a letter filed after oral argument, defendants' counsel contends that all of the amounts appearing in the "other compensation" line for Carter were paid for consulting services, notwithstanding the text of the footnote, based on an extrapolation of a currency exchange rate between Australian and United States dollars and other disclosures

---

[38] Defs.' Opening Br. Ex. B at 9 & n.5 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 14, 2011)) (emphasis added); Defs.' Opening Br. Ex. C at 10 & n.8 (Unilife Corp., Definitive Proxy Statement (Form 14A) (Oct. 16, 2012)) (emphasis added).

[39] Mot. to Dismiss Hr'g Tr. at 40, June 9, 2014.

16

contained in the proxy statement.[40]   Although defendants' explanation makes sense, I cannot resolve this issue from the allegations of the complaint and the face of the proxy statements incorporated therein.  Accordingly, this aspect of the fiduciary duty claim will not be dismissed so that plaintiff can verify in discovery whether the full amounts reported as "other compensation" for Carter were paid solely for consulting services.

### b.    Equity Awards

Insofar as the fiduciary duty claim pertains to the equity awards the outside directors received, defendants argue that they are protected by the business judgment rule because each of those awards was approved by a disinterested majority of Unilife's stockholders.  I agree and dismiss this aspect of the fiduciary duty claim because plaintiff has failed to plead facts to legitimately call into question the validity of the stockholders' approval or to rebut the presumption of the business judgment rule.

In a series of decisions, this Court has dismissed otherwise self-interested transactions involving director compensation because of the effect of stockholder approval of such transactions.  In *Steiner*, discussed above, after sustaining a claim for breach of fiduciary duty challenging the cash payments made to the outside directors of Telxon, Chancellor Allen dismissed that part of the claim challenging stock option grants to them based on stockholder approval of the plan under which the options were granted. He explained that:

---

[40] Letter from James G. McMillan, III to The Honorable Andre G. Bouchard (June 9, 2014).

17

> Unlike the other self-interested transactions challenged by plaintiff, the stock option plan was presented to the Telxon shareholders at the 1991 annual meeting and approved by a majority of the stockholders. The Supreme Court held in *Kerbs v. California Eastern Airways, Inc.*, Del. Supr., 90 A.2d 652, 655 (1952) that "[s]tockholders' ratification of voidable acts of directors is effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was *ultra vires*, illegal, or fraudulent." [41]

Chancellor Allen thus held that, in the absence of any allegation that "the option plan was *ultra vires*, illegal or fraudulent, the only basis on which the plan may be successfully attacked is that it constitutes a gift of corporate assets or waste."[42]

Several years later, in *In re 3COM Corp. Shareholders Litigation*, the Court cited *Steiner* with approval and held that "[d]ecisions of directors who administer a stockholder approved director stock option plan are entitled to the protection of the business judgment rule, and, in the absence of waste, a total failure of consideration, they do not breach their duty of loyalty by acting consistently with the terms of the stockholder approved plan."[43] More recently, in *Desimone v. Barrow*s, then-Vice Chancellor Strine dismissed under Rule 12(b)(6) claims challenging option grants to outside directors because "stockholders approved the issuance of the exact number of options to be awarded annually to the Outside Directors and the date of issuance."[44]

---

[41] *Steiner*, 1995 WL 441999, at *7.

[42] *Id.*

[43] *In re 3COM Corp.*, 1999 WL 1009210, at *1 (Del. Ch. Oct. 25, 1999).

[44] *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007).

Here, as in *Desimone*, Unilife's stockholders approved each of the specific equity awards challenged in this action. As explained above, in 2010, Unilife stockholders approved the grant of up to 100,000 options to two of the Company's outside directors and, in 2011, approved the grant of up to 45,000 stock-based awards to six of the Company's outside directors.

Plaintiff alleges that these stockholder approvals were not valid because the proxy statements on which the votes were based "omitted or included materially misleading information concerning, *inter alia*, whether the Unilife's outside director compensation is in line with director compensation paid at comparable firms, the identity of truly comparable companies, and the average director compensation at those firms."[45] Significantly, plaintiff has not identified any Delaware authority deeming such benchmarking information to be material. Nor has plaintiff identified any provision of the federal securities laws requiring the disclosure of such information concerning outside director compensation.

Under Delaware law, "[t]o state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3)

---

[45] Compl. ¶ 25. As plaintiff acknowledges, the benchmarking information Unilife provided in its proxy statements only concerned executive compensation and not outside director compensation. Pl.'s Answering Br. 38. As such, the issue here is not whether the disclosures contained in the proxy statements were misleading, but whether Unilife omitted material information by failing to include benchmarking information relevant to outside director compensation.

information that (4) was omitted from the proxy materials."[46]  "The burden of establishing materiality rests with the plaintiff, who must demonstrate 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[47]

In my opinion, the absence of benchmarking information for outside director compensation was not a material omission from Unilife's 2010 and 2011 proxy statements because the proxy statements disclosed all material terms of the precise equity awards that the stockholders were being asked to approve.

The 2010 proxy statement disclosed the exact number of options to be awarded to directors Wold and Firestone (100,000 each), the exercise price for those options ($6.83 per share for Wold and $6.19 per share for Firestone), the exercisability period for the options (five years from the date of grant) and the schedule over which the options would vest.  Similarly, the 2011 proxy statement  disclosed the exact number of equity awards to be issued to directors Bosnjak, Carter, Galle, Lund, Wold and Firestone (45,000 each), the nature of those awards (shares of common stock of phantom stock units), and the schedule over which those awards would vest.  Thus, whether or not the value of these

---

[46]*Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 926 (Del. Ch. 1999)).

[47] *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).

equity awards, viewed in isolation or together with other compensation, were in line with the levels of compensation paid to the outside directors of Unilife's alleged peer companies, Unilife's stockholders cannot legitimately claim they were not made aware of the material terms of what they were being asked to approve.[48]

Because plaintiff has failed to undermine the validity of the stockholder approvals on which the equity awards in question were expressly conditioned, the business judgment rule applies to the board's decision to grant those awards in the first instance. "[W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'"[49] Although plaintiff has alleged facts suggesting that the amount of compensation paid to Unilife's directors may be excessive relative to its revenues and its alleged peers, it cannot be said that the payment of such compensation had no rational business purpose.

For the foregoing reasons, I grant defendants' motion to dismiss the fiduciary duty claim insofar as it relates to the equity awards that were approved by Unilife's stockholders.

### 2. The Waste Claim

"[A] plaintiff faces an uphill battle in bringing a waste claim, and a plaintiff must allege particularized facts that lead to a reasonable inference that the director defendants

---

[48] *See 3COM*, 1999 WL 1009210, at *1 (rejecting need to disclose option values under Black-Scholes where "the plan's material terms" were disclosed).

[49] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 654 n.41 (Del. 2014) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (citation omitted)).

authorized an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[50] This Court has described the waste standard as an "extreme test, very rarely satisfied by a shareholder plaintiff, because if under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends."[51] "Where . . . the corporation has received any substantial consideration and where the board has made a good faith judgment that in the circumstances the transaction was worthwhile, a finding of waste is inappropriate, even if hindsight proves that the transaction may have been ill-advised."[52]

The complaint alleges that the compensation paid to Unilife's directors since 2010 constitutes an excessive percentage of its revenues during this period (25% and 24%, respectively, in fiscal years 2012 and 2013) and is excessive relative to eleven other healthcare companies with market capitalizations between $41 million and $718 million. These allegations raise questions concerning the fairness of the outside directors' compensation, but they do not rise to the level necessary to establish a complete failure of consideration or that the director defendants authorized an exchange that was so one-sided that no reasonable business person could conclude that Unilife received adequate

---

[50] *Seinfeld*, 2012 WL 2501105, at *3  (Jun. 29, 2012) (internal quotation marks and citations omitted).

[51] *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997) (quoting *Steiner*, 1995 WL 441999, at *1).

[52]*Seinfeld*, 2012 WL 2501105, at *9 (internal quotation marks and citations omitted).

22

consideration. Accordingly, the claim for corporate waste fails to state a claim for relief and is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss Count I is GRANTED insofar as it relates to the equity awards issued to Unilife's outside directors, but DENIED insofar as it relates to the cash compensation paid to the outside directors. Count II is dismissed in its entirety.

**IT IS SO ORDERED.**